110 S.W.3d 231 (2003)
In the Interest of W.E.C.
No. 2-02-085-CV.
Court of Appeals of Texas, Fort Worth.
June 5, 2003.
*233 Michael B. Curtis, Wichita Falls, for Appellant.
Lana S. Shadwick, Appellate Atty., Special Litigation Unit, and C. Ed Davis, TDPRS General Counsel, and Phoebe Knauer, Deputy General Counsel, and Cathy Morris, Chief Atty. for Field Operations, and Sarah R. Guidry, Supervising Atty. for Field Operations, Special Litigation, for Appellee.
*234 PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

OPINION
SUE WALKER, Justice.

I. Introduction
A jury found that appellant C.E.'s parent-child relationship with her son, W.E.C., should be terminated, and the trial court entered judgment on the jury verdict, terminating appellant's parental rights. In six issues, appellant contends that the evidence is legally and factually insufficient to support any of the four grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("TDPRS") and is legally and factually insufficient to support the finding that termination is in W.E.C.'s best interest. She also contends that the trial court erred by admitting evidence that was privileged under rule 510 of the Texas Rules of Evidence. We will affirm.

II. Factual and Procedural Background
Appellant has three children, M.E., who was born in October 1990; A.E., born in December 1992; and W.E.C., who was born in February 1999. W.E.C. had a twin sister, but she died of SIDS in June 1999. Appellant is still married to the father of M.E. and A.E., although the couple separated in 1993; neither appellant nor the children have seen him since then. Appellant began a relationship with W.E.C.'s father, R.C., in 1997. Their relationship continued for about three-and-a-half years.
TDPRS first became involved with appellant and her children in February 1999 when her twins were born two months prematurely. Appellant reported to her doctors that she drank heavily during the first four months of her pregnancy, but said she quit when she learned she was pregnant. However, while the twins were hospitalized after birth, appellant became intoxicated, fell, lost consciousness, and had to be taken to the emergency room. A referral was made to TDPRS while the twins were hospitalized. Concerns existed that, because the twins had special medical needs and because appellant drank heavily, appellant might not be capable of taking care of them and their special needs. W.E.C. needed a monitor because he had apnea episodes where he would quit breathing. His sister had other problems, and both children needed measured feeding every three hours around the clock and required extensive follow-up with specialists in Fort Worth.[1]
Appellant was "extremely cooperative" during TDPRS's investigation. TDPRS investigators concluded that appellant's two older boys were functioning relatively well in the home. Following its investigation, TDPRS implemented an in-home safety plan to help prepare appellant for the twins' discharge from the hospital and move home. TDPRS worked with appellant, instructing her not to smoke around the twins, to maintain a clean environment, and to keep smoke out of the home. They talked to her about her living conditions and the changes she needed to make in order to bring the twins home from the hospital. The plan required appellant and R.C. to submit to random urinalysis and to refrain from using alcohol or drugs while the children were in their care. Appellant submitted to a urinalysis ("UA"), and it came back negative. TDPRS determined that, with R.C.'s help and the help of family members, appellant could care for the twins. The twins were allowed to go home, to Wichita Falls, with appellant.
*235 The record shows that W.E.C. experienced developmental delays, with borderline to mild cognitive and speech developmental delays, and a history of disruptive behavior, such as difficulty complying with demands and tantrums. W.E.C. functioned at approximately sixty to seventy percent of the developmental level that he should have demonstrated for his age. He was diagnosed with static encephalopathy, a brain-based problem that is nonprogressive, a probable attention-deficit hyperactivity disorder, and disruptive behavior disorder. W.E.C. was referred and admitted to the North Texas Rehabilitation Center's Infant/Child Development Program. He needed continued therapy, medication, support from specialists, and a structured day-to-day routine. Appellant, however, failed to take W.E.C. to all of his scheduled appointments with specialists. Appellant does not have a driver's license or a car and relies on others for transportation. Despite W.E.C.'s need for continued therapy, appellant eventually discontinued even North Texas Rehabilitation Center's in-home therapy services.
In April 2000, appellant contacted TDPRS to report that R.C. had over-medicated W.E.C. in an effort to make him sleep and had kicked A.E. in the ribs. TDPRS investigated and ruled out a disposition for physical abuse. The investigation nonetheless showed "extensive risk" to the children, causing TDPRS to open a case for the provision of in-home safety services. As part of TDPRS's family preservation plan, both appellant and R.C. were to abstain from drug or alcohol use. Appellant and R.C. tested positive for methamphetamine, cocaine, and amphetamine in a random drug screening conducted on July 17, 2000. All three children were removed from appellant's care.
Appellant claimed that R.C. abused drugs and alcohol, that he got her involved with drugs, and that she became addicted to methamphetamine. Appellant explained that she began shooting up methamphetamine, or speed, in June 1999 about once a month and said her use evolved into a regular, almost daily, habit after September 1999. She and R.C. also occasionally used marijuana, and both abused alcohol. Their relationship was fraught with turmoil, often involving violence.
Appellant's criminal record includes convictions for theft by check, public intoxication, driving while intoxicated, and driving while her license was suspended. She served jail time for each of these offenses. While she was in jail, her stepfather and others cared for her children. Even after TDPRS removed the children, appellant continued her relationship with R.C. She claimed at trial, however, that she last saw R.C. in August 2001, approximately six months before the final termination hearing.
Appellant also claimed at trial that she last used methamphetamine in August 2001. She admitted that she had a drinking problem and said she started drinking at around age sixteen. She said she last drank and became intoxicated in December 2001, the month before the final termination hearing.
Appellant attended three different treatment programsone before TDPRS became involvedbut she completed only one of those programs. After completing the program, appellant failed to continue the weekly outpatient requirements. Appellant maintained that she has attended narcotic and alcohol support group meetings on and off for three years, but claims that she sometimes neglected to provide TDPRS with verification of her attendance at these meetings as she was required to do under her service plans.
Appellant initially failed to cooperate with TDPRS concerning visits to her *236 home. She often refused to answer the door when it appeared she was home, or called TDPRS after a missed appointment and provided some excuse. She later exhibited a greater willingness to cooperate with regard to home visits. Although random drug screenings were required by TDPRS under appellant's service plans, appellant failed to show up for twelve of the eighteen screenings that were requested. The last drug screening appellant failed to attend was in August 2001, five months before the final termination hearing. Out of the six drug screenings appellant did complete, three were positive for marijuana, cocaine, methamphetamine, and amphetamine.
Pursuant to her service plan, appellant did, however, maintain a clean home environment, complete parenting classes, and submit to a chemical evaluation. She also attended some counseling sessions, made all of her scheduled visits with the children, and attended all permanency planning meetings.
In September 2001, TDPRS returned M.E. and A.E. to appellant, but maintained managing conservatorship over the children. W.E.C., however, remained in foster care. Subsequently, TDPRS moved to terminate appellant's parental rights to W.E.C.[2] According to TDPRS, the decision to terminate appellant's parental rights to W.E.C. was based on the services provided to appellant, TDPRS's concerns about appellant's drug and alcohol abuse, and its belief that appellant was unable to meet W.E.C.'s special needs or to provide a safe environment for him.
Trial commenced on January 8, 2002 before a jury. After TDPRS rested its case, appellant moved for a directed verdict, which was denied by the trial court. Following appellant's presentation of evidence, and the jury's determination that appellant's parental rights should be terminated, the trial court entered an order terminating appellant's parental rights to W.E.C. Appellant filed a motion for new trial and it was overruled by the trial court. This appeal followed.

III. Burden of Proof in Termination Proceedings
A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their childrenis perhaps the oldest of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000).
In proceedings to terminate the parent-chid relationship brought under section 161.001 of the family code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated *237 status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. Santosky, 455 U.S. at 746, 102 S.Ct. at 1391; see also Tex. Fam.Code Ann. § 161.001.
Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam.Code Ann. § 101.007; In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002); In re C.H., 89 S.W.3d 17, 25 (Tex.2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979); In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. Addington, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

IV. Sufficiency of the Evidence
In her first four issues, appellant contends that the trial court erred by denying her motion for directed verdict because TDPRS failed to prove by clear and convincing evidence any of the four grounds alleged for termination. TDPRS contends appellant has waived these issues on appeal by failing to renew her request for a directed verdict after the close of all the evidence. TDPRS acknowledges, however, that appellant did raise a legal sufficiency challenge in her motion for new trial.[3] We further note that, although not specifically stated in the points raised on appeal, appellant argues both in her brief and in her motion for new trial that the evidence was also factually insufficient to support the grounds for termination. Thus, we conclude that appellant preserved her legal and factual sufficiency of the evidence challenges. See Tex.R.App. P. 33.1, 38.1(e), 38.9; Sumerlin v. Houston Title Co., 808 S.W.2d 724, 726 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (op. on reh'g).
A. Standard of Review
The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings. In re J.F.C., 96 S.W.3d at 264-68 (discussing legal sufficiency review); In re C.H., 89 S.W.3d at 25 (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate. In re J.F.C., 96 S.W.3d at 265; In re C.H., 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. In re J.F.C., 96 S.W.3d at 265-66; In re C.H., *238 89 S.W.3d at 25. With respect to a legal sufficiency point, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." In re J.F.C., 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child's best interest. In re C.H., 89 S.W.3d at 25.
B. Grounds For Termination
In her first four points, appellant complains that the evidence is legally and factually insufficient to support the jury's findings that (1) she knowingly placed or knowingly allowed W.E.C. to remain in conditions or surroundings that endangered his physical or emotional well-being, (2) she engaged in conduct or knowingly placed W.E.C. with persons who engaged in conduct that endangered his physical or emotional well-being, (3) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain W.E.C.'s return, and (4) any mental illness or deficiency on the part of appellant would in all reasonable probability continue until W.E.C.'s eighteenth birthday, and that all reasonable efforts to return W.E.C. to the home had been made by TDPRS. See Tex. Fam.Code Ann. §§ 161.001(1)(D), (E), (O), 161.003(a).
The evidence at trial showed that W.E.C. had respiratory problems that required daily breathing treatments. Although instructed by TDPRS to refrain and to have others refrain from smoking around W.E.C. and to change her clothing after smoking before being around W.E.C., appellant continued to smoke in and around the house and allowed others to smoke in and around the house while W.E.C. lived with her. Appellant also arrived at visitations smelling of smoke. At the time of trial, the evidence showed that appellant continued to smoke and allowed others to smoke in her home.
There was also evidence that W.E.C. needed the in-home therapy services provided by North Texas Rehabilitation Center for his speech and cognitive delays and that the importance of these services was explained to appellant. Appellant, however, missed several appointments scheduled for W.E.C. and eventually discontinued these services altogether, even after being advised about the detrimental effects this would have upon W.E.C. Dr. Mauk is president and medical director of the Child Study Center, which diagnoses, treats, and educates children with developmental disabilities. She testified that appellant's decision to terminate the services available to W.E.C. through North Texas Rehabilitation Center was not designed to meet W.E.C.'s needs.
The record further shows that appellant was addicted to methamphetamines. She claimed that R.C., also a drug and alcohol abuser, promoted her drug involvement. Although appellant's positive drug screening was the reason her children were removed from her in July 2000, she nonetheless continued her drug use and her relationship with R.C. until five months before trial. Appellant also continued her relationship with R.C. despite the violence involved in their relationship, her belief that R.C. over-medicated W.E.C. to try and get him to sleep, her belief that R.C. kicked one of her older sons in the ribs, and temporary orders following the children's *239 removal requiring that R.C. be restrained from going within a one block radius of appellant.
Among appellant's other court ordered obligations to regain custody of W.E.C., she was to refrain from both drug and alcohol use, complete an in-patient treatment program, submit to appropriate aftercare and follow-up programs, and submit to random drug screenings. Over the course of the eighteen months that W.E.C. remained in foster care, appellant completed only six out of eighteen scheduled screenings. The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs. See In re D.M., 58 S.W.3d 801, 813 (Tex.App.-Fort Worth 2001, no pet.). Additionally, of the six screenings appellant did complete, she tested positive for methamphetamine and other drugs on three occasions. Appellant did eventually complete an in-patient treatment program, and there is evidence she attended narcotics anonymous meetings off and on. However, she failed to comply with the required follow-up program to her in-patient treatment and did not report to TDPRS, as required, about any follow-up treatment.
Appellant also admitted that she is an alcoholic and that she drank during her pregnancy with W.E.C. W.E.C.'s paternal grandmother testified that appellant drank through her entire pregnancy, not just during the first four months. Appellant has a prior arrest for public intoxication and driving while intoxicated, and she completed a treatment program as part of her probated sentence. She relapsed, however, and while W.E.C. was hospitalized following his birth, she drank so much that she fell, lost consciousness, and was taken to the emergency room. Appellant also admitted she drank "before August," i.e., during the time W.E.C. was in foster care, and that she drank to the point of intoxication in December 2001, just one month before trial.
Appellant testified that at the time of trial she was not taking the medication prescribed for her depression. She claimed she did not like the effect it had on her. She was unable to recall the last doctor's appointment she missed, but said she intended to reschedule.
We have carefully reviewed the entire record. Looking at all of the evidence in the light most favorable to the jury's finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that appellant engaged in conduct or knowingly placed W.E.C. with persons who engaged in conduct that endangered his physical or emotional well-being and that appellant failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain W.E.C.'s return. See In re J.F.C., 96 S.W.3d at 266.
Viewing all of the evidence, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, a fact finder could reasonably have formed a firm conviction or belief that appellant engaged in conduct or knowingly placed W.E.C. with persons who engaged in conduct that endangered his physical or emotional well-being and that appellant failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain W.E.C.'s return. See In re C.H., 89 S.W.3d at 25. We overrule appellant's second and third issues.
When multiple grounds for termination are sought and the trial court submits the issue using a broad-form question, we must uphold the jury's findings if any of the grounds for termination support the jury's finding; only one finding under section *240 161.001(1) is necessary to support a judgment of termination. In re D.M., 58 S.W.3d at 813; In re R.C., 45 S.W.3d 146, 149 (Tex.App.-Fort Worth 2000, no pet.); In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); see also Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). Accordingly, because we conclude there is both legally and factually sufficient evidence to support the jury's findings under family code section 161.001, subsections E and O, we need not address appellant's remaining points with respect to the jury's findings under section 161.001, subsection D or section 161.003(a). See Tex.R.App. P. 47.1.
In order to uphold the jury's decision to terminate appellant's parental rights, however, legally and factually sufficient evidence must exist that termination was in W.E.C.'s best interest. See In re D.M., 58 S.W.3d at 814. We, therefore, turn to appellant's fifth issue on appeal.
C. Best Interest
Appellant contends TDPRS failed to prove by clear and convincing evidence that termination of her parental rights was in W.E.C.'s best interest. We again construe appellant's issue as a challenge to the legal and factual sufficiency of the evidence.
A strong presumption exists that the best interest of a child is served by keeping custody in the natural parent. Id. The fact finder may consider a number of factors in determining the best interest of the child, including: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the child's best interest, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976).
"Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. Id. Quite often, the best interest of the child is infused with the statutory offensive behavior. In re D.M., 58 S.W.3d at 814. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. Id. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents. Id. (citing In re C.H., 25 S.W.3d at 52-53).
1. W.E.C.'s Desires
W.E.C. was too young at the time of trial to express his desires. The evidence did show that appellant loved W.E.C. very much, as did his two older brothers, and that they wanted him to come home.
2. Present and Future Physical Emotional Needs and Dangers
As for W.E.C.'s present and future physical and emotional needs and the present and future physical and emotional dangers to him, evidence showed that appellant drank regularly during her pregnancy with W.E.C., although she testified that she only did so for the first four months and that she did not know she was pregnant. There was no definitive evidence, however, that any of W.E.C.'s problems at *241 birth or his developmental delays were due to appellant's alcohol consumption during her pregnancy.
Evidence also showed appellant did not fully appreciate or understand the extent of W.E.C.'s needs following his birth. Christina Burt conducted an investigation of appellant's family based upon the referral made by the hospital following W.E.C.'s birth but before the children's removal. Burt testified that although W.E.C. and his sister were two weeks old when she became involved in their case, appellant had made very little preparation for the twins' arrival. Burt testified that appellant had not assembled a crib for the babies. Burt expressed concern that appellant seemed unfamiliar with some of the twins' medical issues and medical equipment, like W.E.C.'s apnea monitor. She testified that appellant had not been proactive in finding out what resources were available in the community to help her take care of the twins.
Carol Noel, a physical therapist for North Texas Rehabilitation Center, performed an evaluation on W.E.C. when he was four months old. She determined that W.E.C. was developmentally delayed by about two months and had abnormal muscle tone. She recommended that W.E.C. have weekly physical and speech therapy. Although appellant initially seemed interested in W.E.C.'s therapy and was eager to show therapists what W.E.C. could do, she cancelled thirteen of twenty-five appointments. Noel could not complete her service plan with W.E.C. because of his absenteeism. Appellant eventually refused further services for W.E.C., even though she was told discontinuation of therapy would be very detrimental to W.E.C. Overall, W.E.C. fell further behind during the six months Noel worked with him, demonstrating a two to four month developmental delay when appellant discontinued services. Noel could not say whether W.E.C.'s delays were the result of his sporadic therapy visits or were due to his neurological system's inability to progress, despite therapy.
Evidence showed that W.E.C. resumed weekly therapy sessions when he was placed in foster care, and at that time, he was about two to four months delayed in his motor skills, cognitive abilities, and speech, when adjusted for his prematurity. He did not display any aggressive behavior when initially placed in foster care, but developed behavioral problems, or "aggressive outbursts," while in foster care, which were believed to be due to his cognitive delays and frustration over inability to process information and grasp concepts. At the time of trial, W.E.C. had about a seven month delay in his cognitive abilities, was age-appropriate in his motor skills, and had an approximate four to six month speech delay. Dr. Mauk described W.E.C.'s developmental delays as "borderline to mild," meaning that he was functioning somewhere between sixty to seventy percent of the developmental level for his age. W.E.C. was expected to be transferred to the public school system when he reached three years of age for placement in an early childhood education program designed to mainstream him into regular classes in school.
W.E.C. was described as a "special needs" child, who will need more supervision and care than a normal child and who will benefit from a lot of one-on-one time. He responds to consistency and time-out. He will need additional resources for support in school, he will have to work hard, and he will need a "proactive" caregiver who is very supportive of him and able to work with his school. The failure to meet his needs could result in significant harm to him, cause him not to develop to his *242 potential, and cause other problems, such as behavior issues.
3. Parental Abilities
TDPRS caseworkers and therapists testified that appellant was unable to care for W.E.C. and meet his needs in the past and would be unable to meet W.E.C.'s needs in the future. Dr. Sabine, who performed a psychological evaluation on appellant, had serious reservations over appellant's ability to parent W.E.C. effectively. He testified that appellant's low intellectual level, impaired empathy, poor judgment, and relationship with R.C. all created risks regarding her ability to parent a special needs child like W.E.C. He testified that appellant's drug and alcohol abuse interfered with her ability to manage her life. Dr. Sabine also expressed concern about appellant's unstable financial situation and unstable relationships, including her new relationship with another recovering methamphetamine addict. He diagnosed appellant with dependent personality disorder, which is a long-term disorder, characterized by a desperate need to get one's needs met at the expense of other things. This disorder, especially when combined with a chemical dependency problem, makes it difficult for appellant to recognize and meet the needs of her children. He described appellant's parenting abilities as "reactive," as opposed to "proactive." Based on testing, a review of appellant's MHMR records, and the fact that appellant's two older children also possessed special needs, Dr. Sabine expressed "grave" or "strong reservations" about appellant's ability to successfully or safely meet W.E.C.'s special needs. Dr. Sabine admitted he had not evaluated W.E.C.; if he had been given the opportunity to do so it would have "add[ed] a lot to [his] confidence."
Melynn Conway, the TDPRS supervisor over W.E.C.'s case, testified that she did not believe appellant could meet W.E.C.'s needs now or in the future. Conway thought appellant could endanger W.E.C. either by the things she didn't do or by the people she allowed in their home. Conway said she does not believe appellant understands W.E.C.'s needs. She expressed concern that appellant does not have an adequate support system of extended family and friends. According to Conway, appellant's past behavior, her continued use of drugs and alcohol, her missed drug screenings, her failure to comply with aftercare drug treatment, and her violent relationships all demonstrate that W.E.C. is at risk for harm. Conway believed that termination was in W.E.C.'s best interest based on his age, vulnerability, and inability to protect himself.
Although the jury heard evidence of appellant's inability to meet W.E.C.'s needs, evidence was presented showing that appellant was able to care for W.E.C. Testimony established that appellant was able to understand and administer W.E.C.'s breathing treatments. Appellant has the ability to understand the specific things necessary to care for W.E.C.'s special needs and to apply them in her daily life, if appropriately motivated. Noel, one of the therapists that initially worked with W.E.C., testified that she believed appellant was "capable" of providing or helping W.E.C. with the necessary services; appellant did not appear mentally slow and spoke openly with her about W.E.C.'s progress. While Dr. Sabine expressed his "reservations" about appellant's ability to care for a special needs child, he also stated that it was not impossible for her to do so. He said there was no way to know whether appellant could care for W.E.C.'s special needs if she was not given the opportunity to do so. Additionally, while alcohol and drugs interfered with appellant's ability to manage her life, at the *243 time of trial, she had not refused any drug screenings since August 2001 and had not tested positive for any drugs during that time.
The record reflects that, prior to TDPRS's removal of her children, it was appellant who contacted TDPRS for help because of her belief that R.C. had abused her children. Appellant's counselor, Wendy McGuire, testified that TDPRS refers clients to her and that very few people initiate contact with TDPRS to obtain assistance in parenting their children. Conway acknowledged that appellant's contacting TDPRS as a resource was appropriate at the time. Appellant told McGuire that she wanted what was best for her children and admitted that she needed assistance "to get her life together."
McGuire identified appellant's main strengths as her love for her children and that she wanted what was best for her children. She described appellant's weaknesses as (1) tending to put responsibility on others and minimizing her role in incidents, which she noted is consistent with dependent personality disorder; (2) poor communication; and (3) appellant's history of drug and alcohol abuse. She found appellant's insight into the harm and consequences that this caused her children was "service level." Over the course of therapy, appellant developed additional strengths, such as the ability to communicate some of the things she regretted, expressing her thoughts and feelings more, acknowledging her poor choices, engaging in better communication with others, and becoming more compliant with TDPRS. McGuire also believed appellant was motivated to obtain employment to better meet her children's needs. McGuire testified that appellant has made progress in therapy. She has increased self-esteem, more effective communication skills, increased knowledge of parenting skills, and is accepting responsibility for her primary role as parent.
McGuire believed appellant could provide for W.E.C.'s basic needs. Indeed, there was no evidence that appellant was unable to meet her children's nutritional, clothing, or shelter needs. Appellant also expressed motivation to provide for W.E.C.'s special needs. Yet, while McGuire felt appellant was capable of performing the tasks necessary to meet those needs, because of appellant's past inconsistency, she could not predict whether appellant would actually follow through and consistently meet W.E.C.'s needs. McGuire noted that appellant has a limited support system and that her "concrete thinking" placed her on "the low end" of being able to take advantage of available resources. McGuire said, however, that if appellant had more knowledge of the available resources and had adequate transportation, she would be better able to take advantage of these resources.
In June 2001, after rejecting prior attempts by TDPRS to refer her for services, appellant went to MHMR on self-referral to be assessed for services. Appellant's skills training and services coordinator, Natasha Thomas, testified that, in the three to four months that she worked with appellant, appellant appeared responsive to working on problems, became more participatory as sessions progressed, and made progress in her treatment goals. Appellant seemed able to understand instructions and the things they discussed, and she appeared motivated to follow through with the plans they discussed. Thomas acknowledged, however, that appellant failed to attend four of her scheduled appointments, that she was not honest about her sobriety, and that her last contact with appellant was in November 2001. During this time, appellant was also *244 diagnosed with bipolar disorder, but she had not been keeping her doctor's appointments for treatment of this illness. Given appellant's past history, Thomas expressed a "guarded prognosis" as to whether appellant will remain engaged in services.
In addition to W.E.C.'s special needs, there was evidence that both M.E. and A.E. have dyslexia, that A.E. also has ADHD and an anger problem, and that they both receive special education at school for these problems. Burt testified that both children were functioning relatively well in appellant's home when she conducted her investigation in 1999. They were involved in football and baseball and were described by Deena Hundley, whose boys played with appellant's boys, as "well[-]mannered," "good kids," who seemed taken care of. Hundley testified that M.E. and A.E. played at her house and that she has not had any reservations about her boys playing at their house. She observed appellant around both M.E. and A.E., as well as W.E.C. after he was born, and appellant was always good with them and provided a loving, stable environment. Hundley never noticed anything unusual about W.E.C. or anything to indicate W.E.C. wasn't being taken care of; appellant seemed to love him and gave him his breathing treatments. Hundley testified that she believes appellant can care for W.E.C. and that she is a motivated parent. Hundley admitted that she did not know appellant had refused in-home services for W.E.C. She also admitted that she did not spend that much time with appellant and that she did not know appellant had a drug problem.
When M.E. and A.E. were returned home to appellant, she was "elated" and "overwhelmed with joy" to be a mother again and to provide them with care, love, and nurturing. Since M.E. and A.E. have returned home, appellant has recognized their need to maintain the structured environment they experienced in foster care and expressed a strong desire to maintain this structure. She is also more aware of her home environment and of safety issues and is "proactive" in eliminating inappropriate items from her home. Since M.E. and A.E. returned home, appellant has requested help from TDPRS. TDPRS is providing appellant with therapy for M.E. and A.E., but they had only been to one appointment since coming home and were attending another on the day of trial.
Appellant testified that M.E. and A.E. were making Bs and Cs in school before they went to foster care, while their foster mother testified the boys were failing several classes when she got them. Both stated that their grades improved while in foster care, and appellant admitted M.E.'s and A.E.'s grades had fallen since coming back home.
A teacher for each of the boys also testified. Kari O'Brien, M.E.'s teacher for dyslexia, reading intervention, and tutorials, testified that M.E. has mild dyslexia. She said M.E. is usually well-groomed and properly dressed. She has never set up a conference with appellant.
A.E.'s teacher, Jackie Wheat, also testified. She stated that A.E. first came to school in September 2001. A.E. was neatly dressed, ready for school, and prepared. As time passed, A.E. stopped turning in work, his grades started to fall, and he sometimes came to school "not very clean." His appearance and hygiene, however, have improved. Wheat stated that A.E.'s home reports came back with appellant's signature. Appellant attended A.E.'s open house at school, but Thomas was with another parent and didn't speak with appellant. Although appellant twice indicated to Thomas that she would conference with Thomas regarding A.E., appellant never followed through in setting any parent-teacher *245 conferences. Thomas said she did not know A.E. had ADHD until informed by TDPRS.
4. Available Programs
Evidence was presented regarding several programs available to assist appellant and help W.E.C. with his special needs if appellant would take the initiative to avail herself of these programs. Conway testified that, in her opinion, appellant did not have the ability to motivate herself to seek out available resources needed by W.E.C. now or in the future.
5. Acts or Omissions
As for appellant's acts or omissions, the evidence established that appellant has a drug and alcohol problem. Appellant initially told her chemical assessment counselor that she wasn't bothered by her drinking and was more concerned with her drug use. However, appellant said she did not feel her drug use had any affect on her relationship with her children, except that it made her more attentive. Appellant later testified about her alcohol and drug addictions and admitted that her behavior was not showing that she was taking care of her children. Nonetheless, appellant continued to use methamphetamines within five months of the final termination hearing, and she drank to the point of intoxication only a month before the final hearing.
When appellant did have custody of W.E.C., she failed to make all of his scheduled appointments with his specialists and eventually discontinued his in-home therapy with North Texas Rehabilitation Center. Appellant cited problems with the therapists showing up on occasion and her difficulties in arranging the appointments as her reasons for discontinuing the in-home services. The therapists, however, testified that appellant had standing appointments and that she did not provide any specific reasons for discontinuing services.
Once W.E.C. was placed in foster care, appellant was not involved in his therapy sessions. There was evidence, however, that no one sent her notice or requested that she be involved with W.E.C.'s therapy. It was noted that if appellant had been included and asked to attend W.E.C.'s therapy sessions, it may have helped her gain an understanding of W.E.C.'s medical and developmental issues.
There was testimony that appellant appeared motivated to get her children back. McGuire described her participation in counseling as above average for a TDPRS client; she saw appellant thirty-six times, and appellant cancelled six appointments and failed to appear at eleven other appointments. Appellant made all visitations with her children while they were in foster care and her interaction with the older children was described as "appropriate;" appellant "hugged them, gave them gifts, sat down with them, [and] asked [them] questions." Appellant also attended all permanency planning team meetings and participated in the discussions at those meetings.
Appellant admitted that she hasn't "done the right things in the past" and that she turned to alcohol and drugs to help her cope following her daughter's death and her mother's death. She admitted that her past behavior did not constitute "taking care" of her children. Appellant also admitted that her recent drinking relapse occurred because of stress, that she had used both alcohol and drugs in the past to cope with her stress, and that having all three children in her home will be stressful. Appellant explained, however, that she wants a second chance with W.E.C. and a second chance to show everyone she can take care of him. She has *246 learned through her parenting classes that her children should come first. Appellant testified that she understands the concerns expressed regarding her new boyfriend. She said she would be willing to terminate her new relationship if required by TDPRS and if necessary to keep her children.
Appellant said she also realized, after sitting through trial, that W.E.C. has a lot more problems than she first thought. She also testified, however, that she does not believe W.E.C.'s problems are as dire as portrayed by the witnesses at trial and that she loves W.E.C. and is willing to do anything to help him.
6. Plans for W.E.C.
TDPRS's plan for W.E.C. was to terminate appellant's parental rights and place him for adoption. A family who knew W.E.C. from their church's mother's day out program and who took care of him when his foster family was out of town wanted to adopt him.
7. Other Factors
Additional evidence showed that while appellant severed her relationship with R.C. in August 2001, she immediately met and began another relationship with Tim Thompson, a man who lives with his sister behind appellant's house. He is also a recovering methamphetamine addict, and they attend NA meetings together. He considers the December drinking a relapse for both of them, but claims they talked about the situation and how to avoid another incident. Both he and appellant acknowledge that NA recommends that no one engage in a relationship during the first year of treatment or with someone in the same or similar circumstances. They admit they are not following this recommendation. They have discussed moving in together, but have not made a decision. He spends the night at appellant's house two to three times per week while M.E. and A.E. are there, but he admits this situation is not a good example for the boys.
McGuire stated that appellant's new relationship caused her concern. NA advises that individuals not have a relationship within their first year of sobriety because it contributes to the possibility of a relapse. She said appellant's new relationship seems to be following a pattern similar to the pattern appellant demonstrated in her relationship with R.C. McGuire said appellant still has an unhealthy, although new, relationship and has found a new codependent. McGuire said this pattern is consistent with dependent personality disorder. She recalled that appellant admitted putting R.C.'s needs over those of her children. According to McGuire, a real risk exists that appellant will do the same with her new boyfriend. Also, appellant had similar struggles between her family members and her children, and she chose her brothers over the best interests of her children by allowing her brothers to use drugs and alcohol in her home when the boys were present.
In connection with her argument that TDPRS failed to prove by clear and convincing evidence that termination of her rights was in W.E.C.'s best interest, appellant points out that TDPRS obviously believed her parenting skills had improved because the two older boys were returned to her. She contends that TDPRS's return of the two older boys to her when she had been clean for only a month is inconsistent with its refusal to return W.E.C. to her at the time of trial after she had been clean for over four months, as documented by an increased number of random drug screenings. Under the facts presented to the jury in this case, we cannot agree with appellant's contention.
*247 Patricia Barber, a Volunteer Coordinator with Child Advocates, was appointed by the trial court to conduct an independent investigation and to make a recommendation as to what is best for the children. Barber testified that she didn't "necessarily have a problem with the kids that are there." She explained that M.E. and A.E. "are older children and capable, I suppose, of calling if they were in need of some sort of help immediately." Likewise, Conway, the TDPRS supervisor over W.E.C.'s case, testified that a greater risk of harm existed as to W.E.C. because of his age and his special needs. The jury was free to accept this testimony. They could also have accepted Dr. Sabine's testimony that placement of a third, special needs child, like W.E.C., in appellant's home would present an increased risk to all three children. See Moreland v. State, 531 S.W.2d 229, 235 (Tex.Civ.App.-Houston [1st Dist.] 1975, no writ) (concluding findings that surroundings endangered the well-being of two children, but not other children, were not inconsistent where evidence existed supporting the findings).
The jury had the opportunity to view the demeanor of the witnesses throughout trial, to weigh the testimony, and to examine appellant's past behavior as a means of predicting her future conduct. Indeed, appellant has made recent improvements in her life and it is undisputed that she loves her children. There was also evidence, however, indicating appellant's problems continued up until and through trial: appellant had a new relationship with a recovering addict, the month before the final termination hearing she drank to the point of intoxication, and she missed doctor and therapy appointments for both the boys and for herself.
Looking at all of the evidence in the light most favorable to the fact finder's finding that the termination of appellant's parental rights to W.E.C. was in his best interest, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination was in W.E.C.'s best interest. See In re J.F.C., 96 S.W.3d at 266. Giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, and based on our review of the entire record, we hold that a fact finder could reasonably form a firm conviction or belief that the termination of appellant's parental rights would be in W.E.C.'s best interest. See In re C.H., 89 S.W.3d at 25. Accordingly, we hold that the evidence is both legally and factually sufficient to support the jury's best interest finding. We overrule appellant's fifth issue.

V. Admissibility of Evidence
In her sixth and final issue, appellant contends that the trial court erred by admitting evidence that was privileged under rule 510 of the Texas Rules of Evidence. Tex.R. Evid. 510. Specifically, appellant complains that the trial court admitted her privileged communications to her drug treatment counselor, Steve Rueschenberg.
Rule 510 provides that "[c]ommunication between a patient and a professional is confidential and shall not be disclosure in civil cases." Id. TDPRS contends that appellant waived the privilege because she voluntarily disclosed the same information to TDPRS and others. See Tex.R. Evid. 511(1) (providing that privilege is waived if person holding privilege voluntarily discloses or consents to disclosure of any significant part of privileged matter unless such disclosure itself is privileged).
Rueschenberg performed a chemical dependency assessment on appellant on July 31, 2000. He testified about the information appellant disclosed to him regarding her drug and alcohol abuse; her problems *248 with depression, anxiety, and tension; and her abusive relationships. He concluded that statistically a high probability existed that appellant would struggle with chemical dependence, and he recommended long-term treatment. Appellant also disclosed the majority of this information to her caseworkers, therapists, and friends, who all testified at trial. Additionally, appellant herself testified that she abused both drugs and alcohol, that she turned to these substances when she was depressed, and that she had abusive relationships with the children's fathers. Appellant and others also testified concerning appellant's efforts to obtain and remain in treatment for her addictions. We hold that appellant waived her privilege with regard to her communications to Rueschenberg. See Berger v. Lang, 976 S.W.2d 833, 837 (Tex. App.-Houston [1st Dist.] 1998, pet. denied) (concluding that disclosure of significant part of information in State Bar of Texas grievance letter resulted in waiver of confidentiality).
Additionally, because the record contains testimony from appellant and other witnesses that is the same or similar to Rueschenberg's testimony, the record reflects no harm in the admission of his testimony. In determining whether any error in the admission or exclusion of evidence constitutes reversible error, the complained-of error must probably have caused the rendition of an improper judgment. Tex.R.App. P. 44.1(1). The party alleging that the admission of evidence resulted in an improper judgment does not have to show that "but for" its admission, there would have been a different result. McCraw v. Maris, 828 S.W.2d 756, 758 (Tex.1992). Rather, they must show only that the admission resulted in an improper judgment. Id. "A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." City of Brownsville v. Alvarado, 897 S.W.2d 750, 753-54 (Tex.1995). Because other evidence in the record establishes the same facts testified to by Rueschenberg, appellant cannot establish that any error in admitting his testimony constitutes reversible error. See Dalworth Trucking Co. v. Bulen, 924 S.W.2d 728, 736 (Tex.App.-Texarkana 1996, no writ). We overrule appellant's sixth issue.

VI. Conclusion
Having overruled appellant's second, third, fifth, and sixth issues on appeal, we affirm the trial court's judgment.
NOTES
[1] Appellant resides in Wichita Falls.
[2] R.C. voluntarily relinquished his parental rights to W.E.C. and is not a party to this appeal.
[3] A legal sufficiency challenge asserted in a motion for new trial preserves the issue, but only entitles appellant to a new trial. See Horrocks v. Tex. Dep't of Transp., 852 S.W.2d 498, 499 (Tex.1993); In re G.C., 66 S.W.3d 517, 527 (Tex.App.-Fort Worth 2002, no pet.).