

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-211-CV

IN THE INTEREST OF J.W., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellants Lupe C. and Bruce W. appeal the trial court's judgment terminating their parental rights to their child, James.[2] In two issues, Lupe challenges the legal and factual sufficiency of the evidence to support the trial court's family code section 161.001(1) termination ground findings and the trial

---

[1] *See* Tex. R. App. P. 47.4.

[2] Pursuant to Texas Rule of Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.

court's finding that termination of Lupe's parental rights to James is in James's best interest. Bruce's counsel has filed a motion to withdraw as counsel and a brief in support of that motion, averring that Bruce's appeal is frivolous. We will affirm the trial court's judgment terminating Lupe's and Bruce's parental rights to James and grant Bruce's counsel's motion to withdraw.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Lupe is the mother of (1) Gina, who was twenty years old at the time of trial; (2) Alex, who was born in January 1990; (3) Anthony, who was born in March 1991; (4) James, who was born in December 2005; and (5) April, who was born in March 2007. Lupe married Carlos C. in 1992. They separated in 2001, but they remain legally married. Carlos, whom Lupe has not had any contact with for seven years, is the presumed father of James. Bruce, who is the alleged biological father of James, admitted at trial that he is the father of James and April.

Lupe lived with Carlos before the 2001 separation, but he was gone "half the time." Carlos used illegal drugs, and he was "all drugged up" when he would return home. Lupe began using illegal drugs sometime in 1997 or 1998.

James tested positive for cocaine when he was born. Lupe also tested positive for cocaine when James was born, but she claimed that she had smoked a cigarette that—unbeknownst to her—had been laced with cocaine.

Child Protective Services ("CPS") did not remove James from Lupe's care when he was born because CPS developed an initial safety plan involving Lupe's mother, who agreed to care for James. CPS ultimately lost contact with the family.

CPS received a referral on April 3, 2007, that April had tested positive for cocaine when she was born. Lupe also tested positive for cocaine when April was born, but she claimed that she had accidentally ingested the cocaine when she took two capsules of aspirin. CPS performed an investigation and found that there was "Reason to Believe" for physical abuse and neglectful supervision regarding April and James. CPS consequently removed James and April from Lupe's care on April 3, 2007, and the next day Appellee Department of Family and Protective Services ("DFPS") filed its petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship. April died of Sudden Infant Death Syndrome the following month.

CPS developed identical service plans for both Lupe and Bruce, but neither one completed the plans. Lupe attended only thirteen of forty-four scheduled visits with James, and she performed only one of the eight drug tests that CPS requested she take; the test came back positive for cocaine. In October or November 2007, Lupe admitted to Paul Stampp, the CPS caseworker involved in James's case, that she used cocaine after she had a

3

fight with Bruce, who had asked her for money to buy drugs. Bruce used cocaine during the pendency of the twelve-month case about twice a month for five or six months.

The bench trial took place in late April and early May 2008. Stampp testified in part that Lupe and Bruce moved three times during the pendency of the case and that they were evicted from two of the residences. CPS could not locate Lupe and Bruce from August 2007 through October or November 2007. Lupe was living with her daughter Gina at the time of trial. Bruce testified that he has "probably tried every drug in the world," that he has been hospitalized for suicidal tendencies, that he has convictions for possession of a controlled substance and assault, that he was taking multiple prescription drugs, and that he could not provide stable housing for James if James was returned to him. James was living with a foster family that intended to adopt him if the trial court terminated Lupe's and Bruce's parental rights.

On May 6, 2008, the trial court signed an order terminating the parental rights of Lupe, Bruce, and Carlos to James. The trial court found by clear and convincing evidence that Lupe and Bruce each knowingly placed or knowingly allowed James to remain in conditions or surroundings that endangered his physical or emotional well-being, that Lupe and Bruce each engaged in conduct or knowingly placed James with persons who engaged in conduct that

4

endangered James's physical or emotional well-being, and that termination of the parent-child relationship between Lupe and James and between Bruce and James is in James's best interest.[3] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (Vernon 2008). The trial court also found by clear and convincing evidence that Carlos constructively abandoned James and that termination of the parent-child relationship between Carlos and James is in James's best interest. *See id*. § 161.001(1)(N). These appeals followed.

### III. BURDEN OF PROOF AND STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently — to

---

[3] Regarding Bruce, the trial court also made findings pursuant to family code sections 161.001(1)(N) and 161.002(b)(1).

divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard

because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the

7

appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated the relevant conduct provisions of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. EVIDENTIARY SUFFICIENCY OF ENDANGERMENT FINDINGS

In her first issue, Lupe argues that the evidence is legally and factually insufficient to support the trial court's family code section 161.001(1)(D) and (E) endangerment findings.

Endangerment means to expose to loss or injury, to jeopardize. *J.T.G.*, 121 S.W.3d at 125. The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has

8

knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *J.T.G.*, 121 S.W.3d at 125.

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id*.; *D.T.*, 34 S.W.3d at 634.

9

To support a finding of endangerment, the parent's conduct does not necessarily have to be directed at the child, and the child is not required to suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Id.*; *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). A mother's use of illegal drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *J.T.G.*, 121 S.W.3d at 125. A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re J.A.*, No. 02-05-00454-CV, 2006 WL 3114434, at *5 (Tex. App.—Fort Worth Nov. 2, 2006, no pet.) (mem. op.). Thus, parental and caregiver illegal drug use supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125; *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). A factfinder may also reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no

10

pet.).  As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.  *S.D.*, 980 S.W.2d at 763.

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.  *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.  The evidence shows that Lupe used illegal drugs before James was born.  She testified that she began using illegal drugs sometime in 1997 or 1998.  Carlos, her husband, used illegal drugs too and would come home "all drugged up."  Lupe agreed that she exposed her children to drug use in their home.

Lupe used illegal drugs during her pregnancy.  She tested positive for cocaine when James was born in 2005 and when April was born in 2007.  Both James and April tested positive for cocaine when they were born.  Lupe claimed that she unknowingly ingested the cocaine in both instances, but the trial court, as the factfinder, weighed Lupe's credibility and could have chosen to disbelieve her explanations for why she tested positive for cocaine when both James and April were born.  Lupe testified that Bruce brought cocaine into her home on one occasion.  The evidence also revealed that Lupe brought friends who used drugs over to the residence.

11

Lupe used illegal drugs after CPS removed James from her care. During the pendency of the case, Stampp requested that Lupe take eight drug tests. But Lupe only took one, and it came back positive for cocaine. The trial court could have reasonably inferred from Lupe's failure to attend the drug screenings that she avoided the testing because she was using drugs. *See W.E.C.*, 110 S.W.3d at 239. Indeed, Lupe told Stampp sometime in October or November 2007 that she could not take a drug test because she had used cocaine. Bruce also used cocaine during the pendency of the case about twice a month for five or six months. According to Stampp, Lupe has demonstrated an inability to provide a safe environment for James.

Lupe contends that the evidence is legally and factually insufficient to support the trial court's endangerment findings because the facts of this case are different from the facts of three other cases in which the appellate courts determined that the evidence was sufficient to support the trial court's endangerment findings.[4] The factual distinctions between this case and the other cases do not render the evidence in this case legally and factually insufficient.

---

[4] *See In re S.M.L.D.,* 150 S.W.3d 754, 757–59 (Tex. App.—Amarillo 2004, no pet.); *J.T.G.*, 121 S.W.3d at 126; *J.A.*, 2006 WL 3114434, at *5–7.

12

Considering Lupe's drug use before James was born, her drug use during her pregnancy with James, her continued drug use during the pendency of the case, and the evidence of her children's exposure to drugs, the trial court was entitled to find that Lupe engaged in conduct or created an environment that endangered James's physical and emotional well-being. *See J.T.G.*, 121 S.W.3d at 125; *D.M.*, 58 S.W.3d at 812; *J.A.*, 2006 WL 3114434, at *5. Giving due deference to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief or conviction that Lupe knowingly placed James in conditions and engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's environmental endangerment and course of conduct endangerment findings. We overrule Lupe's first issue.

## V. EVIDENTIARY SUFFICIENCY OF BEST INTEREST FINDING

In her second issue, Lupe argues that the evidence is legally and factually insufficient to support the trial court's best interest finding.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed

to be in the child's best interest.  Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008).  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

14

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;

> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

> (C) guidance and supervision consistent with the child's safety;

> (D) a safe physical home environment;

> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *see R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (a) the desires of the child, (b) the emotional and physical needs of the child now and in the future, (c) the emotional and physical danger to the child now and in the future, (d) the parental abilities of the individuals seeking custody, (e) the programs available to assist these individuals to promote the best interest of the child, (f) the plans for the child by these or by the agency seeking custody, (g) the

stability of the home or proposed placement, (h) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (i) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

We have already detailed above the evidence of Lupe's continuing course of illegal drug use, Bruce's drug use, and the evidence that James and April tested positive for cocaine when they were born. Regarding Lupe's living situation, she and Bruce moved three times during the pendency of the case, and they were evicted from two of the residences. Lupe was living with her daughter Gina at the time of trial, though she claimed that she was about to move out. Regarding Lupe's completion of the service plan that CPS formulated for her, the evidence shows that she did not complete individual counseling, she did not complete parenting classes, she did not do a

16

psychological evaluation, she performed only one drug test, she did not provide information that she was ever gainfully employed, and she attended only thirteen of forty-four scheduled visits with James.[5] Lupe testified that she "blacks out" a lot and that she does not read very well. Stampp opined that Lupe could not adequately provide for James's emotional, physical, mental, and spiritual needs, and Stampp reasoned that it is in James's best interest to terminate Lupe's parental rights to James.

As for James, at the time of trial, he was living with a foster family that intended to adopt him if the trial court terminated Lupe's and Bruce's parental rights. James has bonded with his foster parents. Lupe testified that she wanted DFPS or a family member to retain custody of James.

Considering the relevant statutory factors in evaluating Lupe's willingness and ability to provide James with a safe environment and the *Holley* factors—including the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, and the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, all of which weigh in favor of termination—we

---

[5] Stampp canceled two of Lupe's scheduled visits with James.

conclude that in light of the entire record, and giving due consideration to evidence that the factfinder could have reasonably found to be clear and convincing, a factfinder could reasonably have formed a firm belief or conviction that termination of Lupe's parental rights to James is in James's best interest. We hold that the evidence is legally and factually sufficient to support the trial court's section 161.001(2) best interest finding. *See* Tex. Fam. Code Ann. § 161.001(2). Accordingly, we overrule Lupe's second issue.

## VI. BRUCE'S FRIVOLOUS APPEAL

Bruce's court-appointed appellate counsel has filed a motion to withdraw as counsel and a brief in support of that motion. Counsel's brief and motion meet the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no reversible grounds on appeal and referencing any grounds that might arguably support the appeal. *See Anders v. California*, 386 U.S. 738, 741, 87 S. Ct. 1396, 1400 (1967); *Mays v. State*, 904 S.W.2d 920, 922 – 23 (Tex. App.—Fort Worth 1995, no pet.). This court has previously held that *Anders* procedures apply in parental rights termination cases. *In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.). Bruce was given the opportunity to file a pro se brief on his own behalf, but he did not do so.

18

In our duties as a reviewing court, we must conduct an independent evaluation of the record to determine whether counsel is correct in determining that the appeal is frivolous. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays*, 904 S.W.2d at 923. Only then may we grant counsel's motion to withdraw. *See Penson v. Ohio*, 488 U.S. 75, 82 – 83, 109 S. Ct. 346, 351 (1988).

We have carefully reviewed the appellate record and counsel's brief. We agree that the appeal is wholly frivolous and without merit. We find nothing in the record that might arguably support the appeal. *See Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005). Therefore, we grant Bruce's appellate counsel's motion to withdraw.

## VII. CONCLUSION

Having overruled Lupe's two issues, we affirm the trial court's judgment terminating the parent-child relationship between Lupe and James. Having determined that Bruce's appeal is wholly frivolous and without merit and having granted Bruce's appellate counsel's motion to withdraw, we affirm the trial

19

court's judgment terminating the parent-child relationship between Bruce and James.

BILL MEIER<br>
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and MEIER, JJ.

DELIVERED: March 26, 2009