COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-031-CV
 
  
IN 
THE INTEREST OF J.H., A CHILD
 
  
------------
 
FROM 
THE 323RD DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
 
I. Introduction
 
        L.H. 
appeals the trial court’s judgment terminating her parental rights to J.H.  
In twelve issues, L.H. complains that the evidence is legally and factually 
insufficient, that the trial court erred by denying her motion to dismiss based 
on res judicata and by denying her motion to equalize strikes, and that she 
received ineffective assistance of counsel.  We will affirm.
II. Factual and 
Procedural Background
        A.     TDFPS’s[2] Initial Contact in 1996
        L.H., 
born February 1955, is the mother of J.H., born March 1996.[3]  
TDFPS first became involved with L.H. and J.H. in September 1996.[4]  TDFPS received a referral alleging L.H.’s medical 
neglect and neglectful supervision of J.H.  The report alleged that 
five-month-old J.H. was admitted to the hospital after L.H. left him alone in 
the bathtub, and he became submerged under the water.  L.H. resuscitated 
J.H. and called 911.  The referral alleged medical neglect because when the 
ambulance arrived, L.H. did not want J.H. to be taken to the hospital; the 
police had to convince her to let them take J.H. to the hospital.  
Likewise, L.H. wanted to take J.H. home after he was in the hospital and had to 
be talked into letting him stay in the hospital overnight.
        L.H. 
explained that she left J.H. unattended during his bath because she answered a 
phone call from an old friend and forgot about J.H.  A nurse told the CPS 
caseworker that L.H. smelled like alcohol, and L.H. admitted that she mixed and 
drank two strong drinks that evening.  She also admitted that she was being 
treated by a doctor at MHMR and was taking Zoloft.
        The 
CPS caseworker believed that L.H. placed J.H. in a dangerous situation and ruled 
the case “reason to believe for medical neglect and neglectful supervision.”  
Consequently, CPS decided to open a case with the Family Preservation Unit to 
get L.H. intensive services for a short-term period.
        B.     Police 
Involvement in 1999
        In 
March 1999, the police became involved with L.H. and J.H.[5]  
On March 4, 1999, police were dispatched to a restaurant because a patron, L.H., 
was intoxicated.  Officer Kristen Brown testified that when she arrived at 
the restaurant, L.H. was intoxicated: she was swaying, had glassy eyes, slurred 
speech, and smelled like alcohol. L.H. was holding J.H., and Officer Brown asked 
her to put the child down.  Officer Brown feared for J.H.’s safety. L.H. 
told Officer Brown that, although she knew better, she had taken some 
anti-depressants and had drunk some alcohol before she drove herself and J.H. to 
the restaurant.  Some family friends came to pick up J.H., and L.H. became 
hysterical.  Officer Brown arrested L.H. for public intoxication and took 
her to jail because she posed a threat to herself and others.
        On 
March 17, 1999, Corporal Matthew Barron encountered L.H. when he was dispatched 
to an accident scene.  When Corporal Barron arrived at the scene, he found 
L.H.’s car off the road, nose-down in a construction ditch.  J.H. was in 
the back seat, partially strapped in his car seat, but L.H. was standing across 
the road.  Witnesses informed Corporal Barron that L.H. left the scene to 
find a restroom, leaving J.H. in the car.  Corporal Barron noticed a strong 
odor of an alcoholic beverage on L.H.’s breath, and L.H. admitted that she had 
consumed three drinks.  Thereafter, L.H. failed the sobriety tests, and her 
breathalyzer test results were twice the legal limit.  A family friend 
picked up J.H. from the police station.  L.H. ultimately received a DWI 
conviction for this incident.
        Melisa 
Dean, a former CPS worker, testified that she received a referral for L.H. for 
neglectful supervision relating to the above acts.  Dean met with L.H. the 
day after the ditch incident, and L.H. stated that she had felt tipsy, but not 
drunk. L.H. explained that when the accident happened, she was going home after 
being out with friends and that she had left her glasses at home, which is why 
she did not see the construction cones.  L.H. said that she thought that 
because people stopped to help her, they would be trustworthy enough to watch 
J.H. while she went to the bathroom.  When Dean explained to L.H. that 
these strangers could have taken J.H., L.H. responded “that she was a child of 
God, so [J.H.] and [she] would be protected[,] and no harm would come to 
them.”  At trial, when L.H. was asked whether she still believes that it 
was a good decision to leave J.H. in the car, she said her only belief is that 
it is wrong to drink and drive with a child in the car.  CPS temporarily 
removed J.H. from the home following this incident and returned him to the home 
in December 1999.
        C.     Contact 
with Government Authorities in 2000
        On 
March 1, 2000, CPS caseworkers went to L.H.’s apartment to get an affidavit 
notarized. When L.H. answered the door, she appeared to be drunk.  The 
caseworkers saw a vodka bottle in the garbage.  The caseworkers told L.H. 
that she needed to check herself into a rehabilitation facility to address her 
addiction to alcohol.  Initially, the purpose of the caseworkers’ visit 
was not to institute the removal of J.H.; however, when, during the visit, L.H. 
left her apartment with J.H. on her shoulders and ran to the busy highway, the 
situation changed.
        Officer 
Lonnie Brazzell testified that he came into contact with L.H. on March 1, 2000 
when he responded to a call from a CPS caseworker about a woman running on 
Highway 10 with a child on her shoulders.  Officer Brazzell saw L.H. 
running with J.H. on her shoulders and, concerned for L.H.’s and J.H.’s 
safety, told L.H. to stop running.  L.H. did not comply, and Officer 
Brazzell forced her to the ground to keep her from being hit by traffic.  
Officer Brazzell concluded that L.H. was intoxicated because she smelled like 
alcohol and was yelling and stumbling.  Officer Brazzell also noticed that 
L.H.’s mental state fluctuated.  He called John Peter Smith Hospital.  
An ambulance arrived and took L.H. away.  CPS took custody of J.H.  
When asked at trial whether it was a good decision to run on the highway with 
J.H. on her shoulders, L.H. responded that she ran too slowly and that she 
needed a different escape route because “[t]hat doesn’t look safe running on 
the street with a kid on your shoulders.”
        In 
October 2000, the trial court held a trial on TDFPS’s original petition in a 
suit affecting the parent-child relationship and terminated J.H.’s father’s 
parental rights.  The jury also found that L.H. knowingly placed and 
knowingly allowed J.H. to remain in conditions and surroundings which endangered 
his physical and emotional well-being, but that it was not in J.H.’s best 
interest to terminate L.H.’s parental rights to J.H.  Consequently, the 
trial court did not terminate the parent-child relationship between L.H. and J.H. 
at that time.  J.H. remained in TDFPS’s custody.
        D.     Contact 
with Government Authorities in 2001
        On 
January 4, 2001, Officer Duermeyer came into contact with L.H. as a result of a 
domestic disturbance.  The story that Officer Duermeyer received was that 
Michael Schiska[6] was hitting L.H. in the back as 
they were trying to go to sleep and that both had been drinking pretty heavily.  
Officer Duermeyer resolved the situation by sending Schiska to his mother’s 
apartment.  Officer Duermeyer did not recall L.H. asking to file charges.
        On 
April 8, 2001, Officer Niekamp came into contact with L.H. based on another 
domestic disturbance call: the caller reported two people fighting in an 
apartment.  When Officer Niekamp arrived, both L.H. and Schiska smelled of 
alcohol and appeared intoxicated.  L.H. told Officer Niekamp that Schiska 
had struck her all over her body and that she had gotten mad and pushed him off 
the bed.  Officer Niekamp issued tickets for simple assault/family violence 
to both L.H. and Schiska, and Schiska went to his mother’s apartment.
        On 
April 29, 2001, Officer Hendrix came into contact with L.H. when she was lying 
on a street corner.  L.H. explained to him that she had just gotten out of 
rehab, had gone out drinking, had gotten tired, and had decided to lie down to 
rest.  L.H. appeared extremely intoxicated and could not stand upright.  
Officers took L.H. to her apartment and gave her a citation for public 
intoxication.
        E.     Contact 
with Government Authorities in 2002
        Jessica 
Barrientes became L.H.’s caseworker in January 2002 and met with L.H. on 
January 10th to assess whether J.H. could be placed with her.  Barrientes 
informed L.H. that she needed to maintain sobriety, maintain her relationship 
with MHMR, continue on her medications, maintain a stable living environment, 
maintain her visits with J.H., continue to pay child support, and refrain from 
criminal activities.  L.H. stated that she understood her duties; however, 
she did not follow through with them.
        Officer 
Eubank’s April 7, 2002 police report[7] stated that 
L.H. left Alcoholics Anonymous (“AA”), went home, and drank approximately 
one pint of Southern Comfort alcohol in a one-hour period.  Officer 
Evant’s police report from the same date stated that he observed L.H. walking 
behind a steakhouse and that she was barefoot and wet.  L.H. told him that 
she would not hurt him and then proceeded to talk into a black object in her 
hand, calling it her “horse.”  L.H. stated that she was sent home via 
cab from a bar and needed to go back to her car at the bar to retrieve her 
sleeping pills.  Officer Evant noted that L.H. would not stand still and 
was very animated. L.H. also told him that she was a recovering alcoholic and 
bipolar and that she was a child of God and would not drink because that is a 
sin.  Officer Evant proceeded to conduct the horizontal gaze nystagmus 
test, during which L.H. tried to put her nose on the pen rather than follow it 
with her eyes.  Officer Evant concluded that L.H. was intoxicated to the 
point that she was a danger to herself and others.  L.H. was charged with 
public intoxication.
        On 
April 12, 2002, Officer Stacie Whitehead encountered L.H. after a call came in 
that she had left AA and was driving while intoxicated.[8]  
Officer Whitehead responded to the call and observed L.H. in her vehicle, 
drinking an unknown fluid.  As L.H. drove, Officer Whitehead observed L.H. 
run stop signs, turn into the wrong lane, and change lanes without signaling.  
When Officer Whitehead attempted to pull over L.H., she pulled into an apartment 
complex other than her own and then put her vehicle in reverse.  Officer 
Whitehead had to jump out of the patrol car and yell at L.H. to avoid being hit 
by her.  After L.H. stopped, Officer Whitehead asked L.H. to put the 
vehicle in park and hand over the keys. L.H. responded that she would not hand 
over the keys because she did not trust Officer Whitehead.  During this 
time, Officer Whitehead detected a strong odor of an alcoholic beverage about 
L.H.’s person and noticed that L.H. looked delusional and that her eyes were 
dilated.  When Officer Whitehead asked L.H. to get out of the car, she said 
that she had hemorrhoids and was an alcoholic.
        L.H. 
was unable to complete the field sobriety tests.  She repeatedly stopped to 
pray, she told the officers that her light was strong, and she said she was 
distracted by an officer who was chewing gum and by the patrol lights.  L.H. 
was unable to stand upright.  She swayed drastically and stated that she 
was “powerless over alcohol.”  The officers arrested L.H. and 
transported her to the police station.
        At 
the station, during the videotaped sobriety testing, L.H. prayed, danced, sang, 
and took off her clothes.  She was unable to complete the tests.  L.H. 
remained out of control when placed in her jail cell and was ultimately placed 
in the suicidal watch cell and a restraint chair.  L.H.’s actions 
resulted in another DWI conviction.
        On 
April 24, 2002, Officer Meador reported that he had been to L.H.’s apartment 
at 8:44 p.m. because L.H. and Schiska had been arguing.  The police had 
received a call from L.H.’s neighbor requesting that L.H. be removed from the 
neighbor’s apartment.  Officer Meador’s report from April 25, 2002 
states that he was again dispatched to L.H.’s apartment at 12:30 a.m.  
While Officer Meador was en route to L.H.’s apartment, the dispatcher advised 
him that L.H. had gone to a shopping center and was nude from the waist down.  
When Officer Meador arrived at the scene, he detected a strong odor of alcohol 
on L.H.’s breath, and her eyes were watery.  L.H. admitted to Officer 
Meador that she had driven to the shopping center.  Officer Meador did not 
think it would be safe to conduct field sobriety tests on L.H.  He arrested 
her for public intoxication.
        On 
May 1, 2002, Officer Keitel stopped L.H. for a traffic violation.  As L.H. 
exited the vehicle, Officer Keitel smelled alcohol on L.H.’s person and 
noticed that she had red, bloodshot eyes and that she swayed when she walked.  
L.H. was arrested and subsequently convicted for the offense of DWI, her third.
        During 
2002, L.H. missed her monthly visits with J.H. in April, May, June, August, 
September, and November.  Moreover, she made her last child support payment 
on or about April 11, 2002.[9]

        F.     Contact 
with Government Authorities and Inappropriate Actions in 2003
        Approximately 
one week before trial, in early December 2003, the police stopped L.H. for 
speeding and arrested her for driving with a suspended license.  Two days 
before trial, L.H. visited with J.H. and showed him pictures that she brought, 
depicting a man sitting on a toilet and pictures of herself partially naked.  
Barrientes had to tell L.H. to put away the pictures.  Furthermore, L.H. 
testified that she kicked Schiska out of her apartment on December 1, 2003; 
however, she later testified that he had been driving her to the trial each day.
        G.     December 
2003 Trial
        On 
December 16, 2003, the trial court held a jury trial on TDFPS’s petition to 
terminate L.H.’s parental rights.  On April 6, 2004, the trial court 
signed an order of termination based on the jury’s findings by clear and 
convincing evidence that L.H. had (1) knowingly placed or knowingly allowed J.H. 
to remain in conditions or surroundings which endangered his physical or 
emotional well-being, (2) engaged in conduct or knowingly placed J.H. with 
persons who engaged in conduct which endangered his physical or emotional 
well-being, and (3) failed to support J.H. in accordance with her ability during 
a period of one year ending within six months of the date of the filing of the 
petition and that termination of the parent-child relationship between L.H. and 
J.H. would be in the best interest of the child.  The trial court then 
terminated L.H.’s parental rights to J.H.
III. Arguments 
Related to Peremptory Challenges
        L.H. 
filed a pretrial motion to equalize peremptory challenges, claiming that TDFPS 
and J.H.’s guardian ad litem “are aligned as to certain issues in this 
trial, including termination” and accordingly should receive a total of six 
peremptory strikes between them.  The trial court denied the motion during 
a pretrial hearing held about one month before trial.
        Subsequently, 
trial commenced, and at the conclusion of voir dire, TDFPS exercised strikes on 
venire members seven, eight, seventeen, twenty-four, twenty-seven, and 
twenty-nine, while the ad litem exercised strikes on venire members eleven, 
sixteen, eighteen, twenty-three, thirty-one, and thirty-eight. TDFPS and the 
guardian ad litem each exercised six peremptory challenges and made no double 
strikes.  After the parties exercised their strikes and the trial court 
announced the jury panel, L.H. reurged her motion to equalize the peremptory 
challenges.  TDFPS responded that the motion was not timely because the 
strikes had already been made and the jury empaneled.  The trial court 
denied the motion.
        In 
her first issue, L.H. argues that the trial court erred by denying her motion to 
equalize strikes.  In her second issue, she contends that her trial counsel 
rendered ineffective assistance of counsel to the extent, if any, that she did 
not preserve the issue on equalization of strikes.
        A. Error in Allocation of Peremptory Challenges
        As 
a general rule, each party to a civil case in district court is entitled to six 
peremptory challenges.  Tex. R. Civ. 
P. 233.  In multiparty cases, it is the trial court’s duty, before 
the exercise of peremptory challenges, to decide whether any of the litigants 
aligned on the same side of the docket are antagonistic with respect to any 
issue to be submitted to the jury.  Id.  In addition, upon the 
motion of any litigant in a multiparty case, it is also the trial court’s duty 
to “equalize” the number of peremptory challenges so that no litigant or 
side is given an unfair advantage as a result of the alignment of the litigants 
and the award of peremptory challenges.  Id.  Thus, when 
multiple litigants are involved on one side of a lawsuit, the threshold question 
to be answered in allocating peremptory challenges is whether any of those 
litigants are antagonistic with respect to an issue of fact that the jury will 
decide.  See Scurlock Oil Co. v. Smithwick, 724 S.W.2d 1, 5 (Tex. 
1986) (op. on reh’g); Garcia v. Cent. Power & Light Co., 704 S.W.2d 
734, 736 (Tex. 1986); Patterson Dental Co. v. Dunn, 592 S.W.2d 914, 918 
(Tex. 1979).  If no antagonism exists, each side of the docket must receive 
the same number of strikes. Garcia, 704 S.W.2d at 736; Patterson, 
592 S.W.2d at 918; In re M.N.G., No. 2-03-104-CV, 2004 WL 1858135, at *5 
(Tex. App.—Fort Worth Aug. 19, 2004, pet. filed) (op. on reh’g).
        Whether 
antagonism exists between parties is a question of law for the trial court.  
Garcia, 704 S.W.2d at 736; In re J.T.G., 121 S.W.3d 117, 132 (Tex. 
App.—Fort Worth 2003, no pet.). In determining whether antagonism exists, the 
trial court must consider the pleadings, information disclosed by pretrial 
discovery, information and representations made during voir dire, and any 
information brought to the attention of the trial court before the parties 
exercise their peremptory strikes.  Garcia, 704 S.W.2d at 737; J.T.G., 
121 S.W.3d at 132.  We review all questions of law de novo. J.T.G., 
121 S.W.3d at 132; Garner v. Long, 49 S.W.3d 920, 922 (Tex. App.—Fort 
Worth 2001, pet. denied).
        Here, 
the trial court heard L.H.’s motion to equalize peremptory challenges at the 
November 24, 2003 pretrial hearing.  At this hearing, the guardian ad litem 
stated that she did not consider herself exactly aligned with TDFPS, that there 
was more work that she wanted to do on the case before she made her 
recommendation, and that therefore she would like to have her own peremptory 
challenges. The representative for TDFPS testified:
 
And I guess also, just in response to that, that over the past three years while 
this case has just been kind of out there in the [possessory managing 
conservator] status, I sometimes have found myself frustrated that [the guardian 
ad litem] didn’t exactly know where we wanted to be.
 
The 
State has always been firm.  We wanted to terminate, and [the guardian ad 
litem] has really kind of gone back and forth over the years, much to kind of 
the Department’s frustration, about her position, and I just, when I saw this 
motion this morning, my response was, why do you think she’s aligned with us?  
And so I really, I don’t really believe just from the history of the past 
three years that I can say for sure she’s aligned with the Department.

The 
trial court apparently agreed and denied the motion to equalize peremptory 
challenges.  We hold that the trial court did not err by denying L.H.’s 
pretrial motion to equalize peremptory strikes.
        L.H. 
further complains on appeal that, by the time of trial, it was clear that TDFPS 
and the ad litem were not antagonistic with respect to any issue to be submitted 
to the jury, yet TDFPS and the guardian ad litem received twice as many strikes 
as she did (i.e., twelve total to her six), and also received the additional 
benefit of coordinated strikes.  She thus argues that the trial was 
materially unfair.
        Here, 
five issues were submitted to the jury—whether circumstances had changed since 
the October 20, 2000 order, whether L.H. had endangered J.H. through the 
environment in which he was placed or by her conduct, whether L.H. had failed to 
pay child support in accordance with her ability, and whether termination was in 
J.H.’s best interest—and nothing in the pleadings, pretrial discovery, or 
voir dire examination indicates that TDFPS and the guardian ad litem were either 
aligned or antagonistic with respect to any of these issues.[10]  
Thus, in the absence of any evidence of antagonism between TDPFS and the 
guardian ad litem, the trial court erred by determining antagonism existed.  
See Tex. R. Civ. P. 233 
(“it shall be the duty of the trial judge to decide whether any of the 
litigants aligned on the same side of the docket are antagonistic with respect 
to any issue to be submitted to the jury”).  If no antagonism exists, 
each side must receive the same number of strikes.  Garcia, 704 
S.W.2d at 736.  Consequently, because no evidence of antagonism existed 
between TDFPS and the guardian ad litem with respect to the issues to be 
submitted to the jury, we hold that the trial court erred by allocating TDFPS 
and the guardian ad litem twelve peremptory strikes while allocating six 
peremptory strikes to L.H.
        B. Preservation of Error
        Nonetheless, 
TDFPS insists that L.H. failed to preserve error on this issue because she did 
not reurge her motion to equalize until after the strikes were made.  It is 
true that any error in the trial court’s allocation of jury challenges among 
the parties must be preserved by a timely objection.  Van Allen v. 
Blackledge, 35 S.W.3d 61, 65 (Tex. App.—Houston [14th Dist.] 2000, pet. 
denied).  In the Rule 233 context, the proper time to object to the trial 
court’s allocation of peremptory challenges is at the same time that the 
determination of antagonism by the trial court should be made—after voir dire 
and prior to the exercise of the peremptory challenges allocated by the court.  
M.N.G., 2004 WL 1858135, at *6; Van Allen, 35 S.W.3d at 65.
        In 
the present case, L.H. objected after the peremptory challenges were exercised, 
but before the jury was empaneled and sworn.  The jury selection process 
itself, however, concretely revealed the evidence of improper coordination of 
strikes between TDFPS and the guardian ad litem, parties who were purportedly 
adverse.  See M.N.G., 2004 WL 1858135, at *6-7; Van Allen, 35 
S.W.3d at 65.  As soon as L.H. became aware of the improper 
coordination—evidence of alignment as opposed to lack of evidence of alignment 
or antagonism—she reurged her motion to equalize peremptory challenges. Under 
these circumstances, we hold that the error was not waived.  See M.N.G., 
2004 WL 1858135, at *7 (holding that error was not waived where appellant moved 
for mistrial as soon as improper coordination was revealed); Van Allen, 
35 S.W.3d at 65 (same).
        C. Harm Analysis
        We 
next examine whether the trial court’s failure to equalize peremptory strikes 
between the sides constitutes reversible error.  To obtain reversal of a 
judgment based upon an error in the trial court, the appellant generally must 
show that (1) the error occurred, and (2) it probably caused rendition of an 
improper judgment or probably prevented the appellant from properly presenting 
the case to the appellate court. Tex. R. App. P. 44.1(a); In re D.I.B., 
988 S.W.2d 753, 756 & n.10 (Tex. 1999); Tex. Dep’t of Human Servs. v. 
White, 817 S.W.2d 62, 63 (Tex. 1991); M.N.G., 2004 WL 1858135, at *7.  
Once error in the apportionment of peremptory challenges has been found, a 
reversal is required only if the complaining party can show that the trial was 
materially unfair.  See Garcia, 704 S.W.2d at 737 (citing Patterson, 
592 S.W.2d at 920); M.N.G., 2004 WL 1858135, at *7.  This showing is 
made from an examination of the entire trial record. See Garcia, 704 
S.W.2d at 737 (citing Patterson, 592 S.W.2d at 920); M.N.G., 2004 
WL 1858135, at *7.  Evidence that two purportedly antagonistic parties in 
fact collaborated on the exercise of their strikes and did not have any double 
strikes constitutes some evidence that the parties used their positions 
unfairly.  Lopez v. Foremost Paving, Inc., 709 S.W.2d 643, 645 (Tex. 
1986).  Likewise, if the trial is hotly contested and the evidence is 
sharply conflicting, error from the improper allocation of peremptory challenges 
may result in a materially unfair trial without showing more.  See 
Garcia, 704 S.W.2d at 737 (citing Patterson, 592 S.W.2d at 920); M.N.G., 
2004 WL 1858135, at *7; see also Lopez, 709 S.W.2d at 644.
        A 
review of the entire record in this case shows that the evidence presented at 
trial concerning L.H.’s conduct was not sharply conflicting. In fact, L.H. 
admitted as much:
 
Q. [L.H.], you’ve heard a lot of testimony in here about incidents and events 
that occurred, specifically about being arrested for DWI’s and public 
intoxication.
 
Are 
you denying any of them?
 
A. 
No, ma’am.
 
Q. 
Are you denying that you have a problem?
 
A. 
No.

The 
only heavily disputed issue submitted to the jury concerned whether conditions 
had materially and substantially changed since the first termination trial in 
October 2000.  Cf. Van Allen, 35 S.W.3d at 66 (holding review of 
entire record showed trial was hotly contested and that evidence was sharply 
conflicting).  The record does not reveal, however, that TDFPS and the 
guardian ad litem utilized their alignment to influence this issue.
        A 
review of voir dire also does not indicate that L.H. was prejudiced by the 
selection of any of the jurors on the panel.  The jurors selected indicated 
that they would focus solely on the allegations.  Venire member twenty-five 
asked for clarification regarding whether additional conduct against the child 
was necessary to move from foster care to adoption.  Venire member three 
commented that if a situation happens occasionally and the parents are still 
supporting the child financially and emotionally, then that would not be a 
course of conduct.  Venire member five admitted having a niece with a 
substance abuse problem and stated that she is doing wonderfully now and that 
people can get over their addictions.  Moreover, the panel as a whole 
agreed that people with addictions can improve.  Venire member twenty-five 
talked about his youngest daughter’s battle with a mental illness and agreed 
that having a mental illness should not prevent a parent from raising his or her 
child.
        Nothing 
in the voir dire indicates that the failure to apportion strikes among the 
parties resulted in a materially unfair trial that caused the rendition of an 
improper judgment.  Moreover, L.H. does not state which conditional juror(s) 
she would have excluded or what attributes they posed that were unfavorable to 
her.  We hold that, although L.H.’s complaint regarding peremptory 
challenges was not waived and the trial court erred in failing to equalize 
peremptory challenges among the parties, any error on the part of the trial 
court was harmless error and does not require reversal.  See M.N.G., 
2004 WL 1858135, at *8.  We overrule L.H.’s first issue.
        D. 
Ineffective Assistance of Counsel
        In 
anticipation that we might overrule L.H.’s first issue for failure to preserve 
error, her second issue complains in the alternative that her trial counsel was 
ineffective for failing to preserve error with respect to the peremptory strike 
equalization issue.  Because we have held that L.H. preserved error 
regarding her first issue, her second issue is moot, and we will not address it.  
See Tex. R. App. P. 47.1.  
Accordingly, we overrule L.H.’s second issue.
IV. Res 
Judicata and Related Claims
        In 
issues three through six, L.H. argues that the trial court erred by denying her 
motion to dismiss the termination suit based on res judicata and that TDFPS 
failed to satisfy the requisites of section 161.004 of the Texas Family Code 
dealing with termination proceedings after the denial of a previous petition to 
terminate.  TDFPS responds that section 161.004 essentially does away with 
res judicata in parental termination cases and that it complied with section 
161.004.
        A.     Burden of 
Proof in Termination Proceedings
        A 
parent’s rights to “the companionship, care, custody, and management” of 
his or her children are constitutional interests “far more precious than any 
property right.”  Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. 
Ct. 1388, 1397 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 
1985).  The United States Supreme Court, in discussing the constitutional 
stature of parental rights, states, “[T]he interest of parents in the care, 
custody, and control of their children—is perhaps the oldest of the 
fundamental liberty interests recognized by this Court.” Troxel v. 
Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000); J.T.G., 121 
S.W.3d at 123.  Nonetheless, while parental rights are of constitutional 
magnitude, they are not absolute. In re C.H., 89 S.W.3d 17, 26 (Tex. 
2002); J.T.G., 121 S.W.3d at 123.  Just as it is imperative for 
courts to recognize the constitutional underpinnings of the parent-child 
relationship, it is also essential that emotional and physical interests of the 
child not be sacrificed merely to preserve that right.  C.H., 89 
S.W.3d at 26; J.T.G., 121 S.W.3d at 123.
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the Texas Family Code, TDFPS must establish one or more of the acts 
or omissions enumerated under subsection (1) of the statute and must also prove 
that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon 
2002); J.T.G., 121 S.W.3d at 123.  Both elements must be 
established; termination may not be based solely on the best interest of the 
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. 
v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); J.T.G., 121 S.W.3d at 
123-24.  Because of the elevated status of parental rights, the quantum of 
proof required in a termination proceeding is elevated from the preponderance of 
the evidence to clear and convincing evidence.  Santosky, 455 U.S. 
at 746, 102 S. Ct. at 1391; see also Tex. Fam. Code Ann. § 161.001.
        Clear 
and convincing evidence is “the measure or degree of proof that will produce 
in the mind of the trier of fact a firm belief or conviction as to the truth of 
the allegations sought to be established.” Tex. Fam. Code Ann. § 101.007; In re 
J.F.C., 96 S.W.3d 256, 264 (Tex. 2002); C.H., 89 S.W.3d at 25; J.T.G., 
121 S.W.3d at 124.  This intermediate standard falls between the 
preponderance standard of ordinary civil proceedings and the reasonable doubt 
standard in criminal proceedings.  State v. Addington, 588 S.W.2d 
569, 570 (Tex. 1979); J.T.G., 121 S.W.3d at 124; In re D.T., 34 
S.W.3d 625, 630 (Tex. App.—Fort Worth 2001, pet. denied) (op. on reh’g).  
While the proof must be more than merely the greater weight of the credible 
evidence, there is no requirement that the evidence be unequivocal or 
undisputed.  Addington, 588 S.W.2d at 570; J.T.G., 121 S.W.3d 
at 124.  Termination proceedings should be strictly scrutinized, and 
involuntary termination statutes are strictly construed in favor of the parent. Holick, 
685 S.W.2d at 20-21; J.T.G., 121 S.W.3d at 124; In re A.V., 849 
S.W.2d 393, 400 (Tex. App.—Fort Worth 1993, no writ).
        B.     Standard 
of Review for Legal and Factual Sufficiency
        The 
Texas Supreme Court recently clarified the appellate standards of review to be 
applied to legal and factual sufficiency of the evidence challenges in light of 
the clear and convincing evidence burden of proof in termination proceedings.  
J.F.C., 96 S.W.3d at 264-68 (discussing legal sufficiency review); C.H., 
89 S.W.3d at 25 (discussing factual sufficiency review); J.T.G., 121 
S.W.3d at 124.  Because termination findings must be based upon clear and 
convincing evidence, not simply a preponderance of the evidence, the supreme 
court has held that the traditional legal and factual standards of review are 
inadequate. J.F.C., 96 S.W.3d at 265; C.H., 89 S.W.3d at 25; J.T.G., 
121 S.W.3d at 124.  Instead, both legal and factual sufficiency reviews in 
termination cases must take into consideration whether the evidence is such that 
a fact finder could reasonably form a firm belief or conviction about the truth 
of the matter on which the State bears the burden of proof.  J.F.C., 
96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d at 
124.  With respect to a legal sufficiency point, we “look at all the 
evidence in the light most favorable to the finding to determine whether a 
reasonable trier of fact could have formed a firm belief or conviction that its 
finding was true.”  J.F.C., 96 S.W.3d at 266; J.T.G., 121 
S.W.3d at 124-25.  In determining a factual sufficiency point, we must give 
due consideration to evidence that the fact finder could reasonably have found 
to be clear and convincing and then determine whether, based on the entire 
record, a fact finder could reasonably form a firm conviction or belief that the 
parent violated one of the provisions of section 161.001 and that the 
termination of his or her parental rights would be in the child’s best 
interest.  Tex. Fam. Code Ann. 
§ 161.001; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d at 125.
        C.     Factually 
Sufficient Evidence That Circumstances Have Materially and Substantially Changed
        In 
her third issue, L.H. contends that the evidence is factually insufficient to 
establish a material or substantial change in circumstances as required by 
section 161.004(a) of the Texas Family Code. Section 161.004(a) provides that
 
[t]he court may terminate the parent-child relationship after rendition of an 
order that previously denied termination of the parent-child relationship if:
 
(1) 
the petition under this section is filed after the date the order denying 
termination was rendered;
 
(2) 
the circumstances of the child, parent, sole managing conservator, possessory 
conservator, or other party affected by the order denying termination have 
materially and substantially changed since the date that the order was rendered;
 
(3) 
the parent committed an act listed under Section 161.001 before the date the 
order denying termination was rendered; and
 
(4) 
termination is in the best interest of the child.

Tex. Fam. Code Ann. § 161.004.  No 
definite guideline exists as to what evidence constitutes a material change of 
circumstances or conditions that affect the welfare of a child.  Wright 
v. Wright, 610 S.W.2d 553, 555 (Tex. Civ. App.—Houston [1st Dist.] 1980, 
no writ).  A determination must be made in each case according to the 
circumstances as they arise.  Id.  In an analogous situation, 
such as modification of a custody decree, a material change of conditions exists 
where there has been a marriage of one of the parties, one of the parties 
becomes an improper person for custody, a change in the home surroundings has 
occurred, or some other similar material change of conditions.  Leonard 
v. Leonard, 218 S.W.2d 296, 301 (Tex. Civ. App.—San Antonio 1949, no 
writ).
        Although 
L.H. argues that the circumstances remained static between October 2000 and 
December 2003 (i.e., she was alcoholic and bipolar in 2000 and in 2003), the 
record demonstrates that her problems became more acute after the denial of the 
termination in October 2000.  During the interim between the two trials, 
the police encountered L.H. on at least nine occasions.  For instance, on 
January 4, 2001 and April 8, 2001, L.H. contacted the police to break up 
altercations between Schiska and herself.  L.H. received a citation for 
simple assault/family violence as a result of the April 8, 2001 altercation.  
On April 29, 2001 and April 7, 2002, L.H. received public intoxication citations 
for her behavior.  On April 12, 2002, L.H. received her second DWI 
citation.  On the night of April 24, 2002, the police responded to a call 
regarding an argument between L.H. and Schiska and received another call a few 
hours later in the early morning hours of April 25, 2002, at which time they 
cited L.H. for another public intoxication violation.  On May 1, 2002, L.H. 
received her third DWI citation.  In early December 2003, police cited L.H. 
for driving while her license was suspended.  Furthermore, just days before 
trial, L.H. brought inappropriate pictures to her visit with J.H. and had to be 
instructed by the caseworker to put them away.
        These 
facts demonstrate that L.H. had not gotten her alcohol addiction under control.  
Rather than taking steps towards regaining possession of J.H., L.H. missed six 
of her monthly visits with J.H. in 2002.  Moreover, L.H. made her last 
child support payment on or about April 11, 2002.
        Giving 
due consideration to evidence that the fact finder could have found to be clear 
and convincing, and based on our review of the entire record, we hold that a 
reasonable trier of fact could have formed a firm belief or conviction that the 
circumstances had materially and substantially changed since the trial court 
rendered the October 2000 order.  Accordingly, we hold that the evidence is 
factually sufficient to support the jury’s finding that the circumstances had 
materially and substantially changed.  We overrule L.H.’s third issue.
        D.     Trial 
Court Properly Denied Motion to Dismiss Based on Res Judicata
        In 
her fourth issue, L.H. contends that the trial court erred by denying her motion 
to dismiss based on res judicata.  L.H. relies on Slatton v. Brazoria 
County Protective Services Unit for her contention that res judicata bars 
the court’s consideration of allegations proved in the October 2000 trial.  
804 S.W.2d 550, 553 (Tex. App.—Texarkana 1991, no writ) (holding that prior 
denial of termination was not complete bar to subsequent action, but did bar 
admission of parents' conduct occurring prior to denial order).  TDFPS 
responds that res judicata is inapplicable because the Department complied with 
section 161.004.
        The 
question whether res judicata applies in a given instance is a mixed question of 
law and fact. Ex parte Myers, 68 S.W.3d 229, 231 (Tex. App.—Texarkana 
2002, no pet.); Pony Express Courier Corp. v. Morris, 921 S.W.2d 817, 820 
(Tex. App.—San Antonio 1996, no writ).  When a matter involving both 
factual determinations and legal conclusions is decided by the trial court, 
Texas appellate courts generally use an abuse of discretion standard of review.  
Ex parte Myers, 68 S.W.3d at 231-32. In applying this standard, we defer 
to the trial court's factual determinations as long as they are properly 
supported by the record, and we review its legal determinations de novo.  Pony 
Express, 921 S.W.2d at 820.
        The 
legislature implemented Texas Family Code section 161.004 in 1995, TDFPS 
contends in response to concerns created by the res judicata holding in Slatton.  
See Tex. Fam. Code Ann. § 
161.004; In re A.D.C., No. 04-02-00385-CV, 2003 WL 141133, at *1 (Tex. 
App.—San Antonio Jan. 22, 2003, no pet.) (not designated for publication); see 
also In re T.V., 27 S.W.3d 622, 624 n.1 (Tex. App.—Waco 2000, no pet.) 
(“This provision [section 161.004] was passed in response to the concern 
created by the holding in Slatton.”).  As set forth above, section 
161.004 allows a trial court to terminate the parent-child relationship after 
rendition of an order that previously denied termination of the parent-child 
relationship only if (1) the petition is filed after the date the order denying 
termination was rendered, (2) the circumstances of a party affected by the order 
denying termination have materially and substantially changed since the date 
that the order was rendered, (3) the parent committed an act listed under 
section 161.001 before the date the order denying termination was rendered, and 
(4) termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.004(a).  
Additionally, section 161.004(b) provides that “[a]t a hearing under this 
section, the court may consider evidence presented at a previous hearing in a 
suit for termination of the parent-child relationship of the parent with respect 
to the same child.”  Id. § 161.004(b).
        Here, 
the petition under section 161.004 was filed on April 4, 2003, which was after 
the October 20, 2000 order denying termination, satisfying section 
161.004(a)(1).  Id. § 161.004(a)(1).  As previously shown, the 
evidence was factually sufficient to support the jury’s finding that the 
circumstances had materially and substantially changed since the 2000 order was 
rendered, satisfying section 161.004(a)(2).  Id. § 161.004(a)(2).  
Moreover, the jury from the first termination hearing in 2000 specifically found 
that L.H. knowingly placed and knowingly allowed J.H. to remain in conditions 
and surroundings which endangered his physical and emotional well-being, 
satisfying section 161.004(a)(3)’s requirement that the parent must have 
committed an act in violation of section 161.001 before the order denying 
termination was rendered.  Id. § 161.004(a)(3).  And, finally, 
the jury found that termination of L.H.’s parental rights was in the best 
interest of J.H., satisfying section 161.004(a)(4).  Id. § 
161.004(a)(4).
        In 
sum, TDFPS complied with the provisions of section 161.004(a). Id. § 
161.004(a).  After TDFPS satisfied section 161.004(a), the trial court was 
statutorily authorized under subsection (b) to consider all of the evidence 
presented at the previous termination suit between L.H. and J.H. Id. § 
161.004(b).  This statutory authorization permitting consideration of the 
same evidence previously presented during the prior termination trial defeats 
L.H.’s res judicata claims.  Cf. T.V., 27 S.W.3d at 625 (Vance, 
J., concurring) (stating that section 161.004 was designed to eliminate argument 
that evidence of events prior to earlier order denying termination cannot be 
considered).  We hold that the trial court did not abuse its discretion by 
denying L.H.’s motion to dismiss based on res judicata. We overrule L.H.’s 
fourth issue.
        E.     Legally 
and Factually Sufficient Evidence of Section 161.001 Acts[11]

        Under 
her fifth and sixth issues, L.H. argues that (1) the jury in 2003 was required 
to find that the jury in 2000 found that at least one section 161.001 ground for 
termination existed and (2) that no evidence, or alternatively factually 
insufficient evidence, exists in the present record as to what acts the jury in 
2000 found.  Section 161.004(a)(3) reads, “The court may terminate the 
parent-child relationship after rendition of an order that previously denied 
termination of the parent-child relationship if . . . the parent committed an 
act listed under Section 161.001 before the date the order denying termination 
was rendered.”  Tex. Fam. Code 
Ann. § 161.004(a)(3).
        Here, 
TDFPS filed its second petition to terminate L.H.’s parental rights to J.H. 
under the same cause number as the prior suit because there was an ongoing case 
in which TDFPS was continuing to be managing conservator of J.H.  Thus, the 
clerk’s record before us and before the trial court contains the court’s 
charge from the first termination trial.  The court’s charge reflects 
that the jury affirmatively found that L.H. “knowingly placed or knowingly 
allowed the child, [J.H.], to remain in conditions or surroundings which 
endangered the physical or emotional well-being of [J.H.].”  Thus, the 
prior jury found that L.H. committed an act listed under section 161.001 before 
the date the order denying termination was rendered.  See id.  
The prior jury’s finding that L.H. committed an act listed under section 
161.001 before the order denying termination was rendered is sufficient to 
satisfy section 161.004(a)(3)’s requirement.  Id.  We 
overrule L.H.’s fifth and sixth issues.

V. Legally and Factually Sufficient Evidence Regarding Endangering
Course of 
Conduct
 
        In 
her ninth and tenth issues, L.H. contends that the evidence is legally and 
factually insufficient under section 161.001(1)(E) of the Texas Family Code to 
show that she engaged in conduct or knowingly placed J.H. with persons who 
engaged in conduct that endangered his physical or emotional well-being.
        In 
proceedings to terminate the parent-child relationship brought under section 
161.001 of the family code, the petitioner must establish one or more of the 
acts or omissions enumerated under subdivision (1) of the statute and must also 
prove that termination is in the best interest of the child.  Id. § 
161.001(1); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984).  
Both elements must be established; termination may not be based solely on the 
best interest of the child as determined by the trier of fact.  Boyd, 
727 S.W.2d at 533.
        Endangerment 
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d 
at 533; J.T.G., 121 S.W.3d at 125; see also In re M.C., 917 S.W.2d 
268, 269 (Tex. 1996).  Under section 161.001(1)(E), the relevant inquiry is 
whether evidence exists that the endangerment of the child’s physical 
well-being was the direct result of the parent’s conduct, including acts, 
omissions, or failures to act.  J.T.G., 121 S.W.3d at 125.  
Additionally, termination under section 161.001(1)(E) must be based on more than 
a single act or omission; a voluntary, deliberate, and conscious course of 
conduct by the parent is required. Tex. Fam. Code Ann. § 161.001(1)(E); J.T.G., 
121 S.W.3d at 125.
        However, 
it is not necessary that the parent’s conduct be directed at the child or that 
the child actually suffer injury. Boyd, 727 S.W.2d at 533; J.T.G., 
121 S.W.3d at 125.  The specific danger to the child’s well-being may be 
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d 
at 533; In re R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, 
pet. denied).  As a general rule, conduct that subjects a child to a life 
of uncertainty and instability endangers the physical and emotional well-being 
of a child.  R.W., 129 S.W.3d at 739. Drug use and its effect on a 
parent’s life and her ability to parent may establish an endangering course of 
conduct.  Id. Further, a parent’s mental state may be considered 
in determining whether a child is endangered if that mental state allows the 
parent to engage in conduct that jeopardizes the physical or emotional 
well-being of the child.  Id.
        The 
record reveals a pattern of continued domestic violence and alcohol abuse 
involving L.H. L.H. admitted that she had to call the police to intervene in 
some of the fights that she had with Schiska because he was physically abusive 
towards her.  She described the incident that occurred on January 2001 when 
Schiska punched in her in the back and another incident on April 8, 2001 when 
Schiska struck her all over her body.  In April 2002, police intervened 
twice due to arguments between L.H. and Schiska, including a fight where L.H. 
sought refuge in a neighbor’s apartment.  Yet, L.H. admitted that she 
continued to see Schiska after the altercations and that she relied on him for 
transportation to the December 2003 trial.
        The 
evidence demonstrates that L.H. continuously abused alcohol, despite her 
knowledge that she was not allowed to drink alcohol with her depression 
medication.  Alcohol played a key role in the domestic violence events 
described above.  L.H.’s abuse of alcohol led to three citations for 
public intoxication and three DWI convictions, including the DWI where L.H. ran 
off the road with J.H. in the car.
        The 
record also suggests that L.H. often lacked emotional stability.  L.H. 
admitted to police officers and CPS caseworkers that came into contact with her 
that she suffered from depression and had been diagnosed as bipolar.  
Often, L.H. quoted the Bible and justified dangerous actions by saying that she 
was protected by God.
        L.H. 
displayed emotional instability when Dean attempted to get her an alcohol 
assessment in March 1999. An alcohol assessment at All Saints Hospital was 
arranged for L.H. while she was at Charter Hospital.  Dean told L.H. that 
Dean would follow L.H. home from Charter, take her to see J.H.,[12] and then take her to the alcohol assessment at All 
Saints.  L.H. drove away, not waiting for Dean to follow her.  When 
Dean arrived at L.H.’s apartment, she was on the phone, talking in “hyper 
speech.”  Dean had to tell L.H. step-by-step what to pack for J.H. and 
L.H. because L.H. could not seem to comprehend what was involved in packing for 
two people.  During the drive from L.H.’s apartment to see J.H., L.H. 
went from being calm to suddenly clapping very loudly and squealing that she was 
going to see her baby.  Initially during the visit with J.H., L.H. acted 
appropriately; then she started hollering loudly, accusing Dean of speaking evil 
about her.  According to Dean, L.H. exhibited erratic behavior, her face 
became very red and her eyes really glassy, and she had a disheveled appearance.  
L.H. began to scream and grabbed J.H. when Dean said that they needed to end the 
visit and go to the hospital.
        On 
the ride to the hospital, L.H. went from tearful and loud to calm and stated 
that she was starving to death and had not eaten in days.  Dean stopped and 
purchased food for L.H.  After eating, L.H. started clapping loudly and 
hollering “I’m so sick,” whispered that she had laryngitis, and went back 
to screaming Scriptures and a sequence of numbers. L.H. also grabbed and pinched 
at her genital area and said that it itched badly.  During this time, Dean 
became concerned for her own safety and called her mother to let her know that 
she was taking a client to All Saints.
        Once 
at the hospital, L.H.’s condition became more extreme.  She dropped her 
bags and started hopping and skipping like a child.  While they were 
checking in, L.H. screamed and rambled and then whispered her sequence of 
numbers.  She would not sit upright in the chairs and continued picking at 
her crotch.  During the wait before the assessment, L.H. stated that she 
had to use the bathroom and then started dancing.  After she came back from 
the bathroom, she pulled down her sweat pants.  All Saints admitted L.H. to 
the psychiatric unit because she was having a psychotic episode due to mixing 
alcohol[13] with her psychotropic medication and not 
having slept in several days.
        L.H. 
contends that none of the incidents of bad conduct after October 2000 occurred 
in J.H.’s presence because he was in the possession of his foster parents.  
However, as mentioned above, section 161.004(a)(3) specifically requires the 
trial court to find that the parent committed an act listed under Section 
161.001 before the date the order denying termination was rendered. Tex. Fam. Code Ann. § 161.004(a)(3).  
Consequently, the trial court was free to look at the events from September 
1996, March 1999, and March 2000 in making its determination.  Moreover, 
L.H. showed J.H. inappropriate pictures just two days before trial.
        We 
have carefully reviewed the entire record. Looking at all the evidence in the 
light most favorable to the jury’s finding, giving due consideration to 
evidence that the fact finder could have found to be clear and convincing, we 
hold that a reasonable trier of fact could have formed a firm belief or 
conviction that L.H. engaged in conduct or knowingly placed J.H. with persons 
who engaged in conduct that endangered his physical or emotional well-being.  
See R.W., 129 S.W.3d at 743-44; J.T.G., 121 S.W.3d at 127; see 
also In re Uvalle, 102 S.W.3d 337, 343-44 (Tex. App.—Amarillo 2003, no 
pet.) (holding evidence factually sufficient to support termination of 
mother’s parental rights where alcoholism and drunk driving evidence supported 
conduct theory of termination).
        L.H. 
also challenges the legal and/or factual sufficiency of the two remaining 
statutory grounds for termination found by the trial court.  However, only 
one finding under section 161.001(1) is necessary to support a judgment of 
termination. Tex. Fam. Code Ann. § 161.001(1); In 
re J.J.O., 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.); see 
also Tex. Dep’t of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) 
(op. on reh’g).  Accordingly, because we hold that there is both legally 
and factually sufficient evidence to support the trial court’s finding under 
family code section 161.001(1)(E), we need not address L.H.’s seventh, eighth, 
and eleventh issues pertaining to the trial court’s findings under section 
161.001(1), subsections D and F.  See Tex. Fam. Code Ann. § 161.001(1)(D), 
(E), (F); Tex. R. App. P. 47.1; J.J.O., 
131 S.W.3d at 630.  We overrule L.H.’s ninth and tenth issues.
VI. Termination 
Was In J.H.’s Best Interest
        In 
her twelfth issue, L.H. contends that the evidence is factually insufficient to 
show best interest.  Specifically, L.H. argues that there was no evidence 
that J.H.’s foster parents were unwilling to continue in their capacity as 
foster parents; therefore, L.H. maintains that the status quo was in J.H.’s 
best interest until such time as his foster placement was threatened.[14]
        A 
strong presumption exists that the best interest of a child is served by keeping 
custody in the natural parent. In re W.E.C., 110 S.W.3d 231, 240 (Tex. 
App.—Fort Worth 2003, no pet.).  The fact finder may consider a number of 
factors in determining the best interest of the child, including the following: 
the desires of the child, the present and future physical and emotional needs of 
the child, the present and future emotional and physical danger to the child, 
the parental abilities of the person(s) seeking custody, programs available to 
assist those persons in promoting the child’s best interest, plans for the 
child by those individuals or by the agency seeking custody, the acts or 
omissions of the parent that may indicate that the existing parent-child 
relationship is not appropriate, and any excuse for the acts or omissions of the 
parent.  Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976); W.E.C., 
110 S.W.3d at 240.
        “Best 
interest” does not require proof of any unique set of factors, nor does it 
limit proof to any specific factors.  Holley, 544 S.W.2d at 371-72; W.E.C., 
110 S.W.3d at 240.  Quite often, the best interest of the child is infused 
with the statutory offensive behavior.  W.E.C., 110 S.W.3d at 240.  
While there are instances where the offending behavior will demand termination 
of parental rights, there are also those cases where the best interest 
determination must have a firm basis in facts standing apart from the offending 
behavior.  Id.  Although such behavior may reasonably suggest 
that a child would be better off with a new family, the best interest standard 
does not permit termination merely because a child might be better off living 
elsewhere.  Id.  Termination should not be used to merely 
reallocate children to better and more prosperous parents.  Id.
        J.H. 
did not testify at trial.  However, the evidence demonstrates that he told 
his foster mom that he wants her and her husband to be his parents.  
Additionally, Barrientes testified that she believes that J.H. wants to be 
adopted because he has bonded with his foster family and refers to them as his 
mom, dad, and brothers.  Moreover, she believes that termination is in 
J.H.’s best interest because foster children desire permanency.
        The 
record did not reveal that J.H. had any special physical or emotional needs.  
His foster mother testified that in the event L.H.’s parental rights were 
terminated, J.H. would receive counseling to deal with the termination.
        The 
endangering course of conduct discussion above addressed the present and future 
physical and emotional dangers to J.H., as well as L.H.’s parental abilities 
and acts and omissions.  L.H.’s erratic behavior—resulting from her 
abuse of alcohol and her failure to properly take her psychotropic medications 
as directed—led to citations for public intoxication and DWIs and eventually 
resulted in missed visits with J.H.  Moreover, L.H.’s continued 
relationship with Schiska, in which the police intervened on several occasions, 
also placed J.H. at risk for harm.  Therefore, TDFPS’s plan for J.H. was 
to terminate L.H.’s parental rights and place him for adoption with his foster 
parents, which would provide the permanency lacking under the status quo.[15]
        Giving 
due consideration to evidence that the fact finder could have found to be clear 
and convincing, and based on our review of the entire record, we hold that a 
reasonable trier of fact could have formed a firm belief or conviction that the 
termination of L.H.’s parental rights would be in J.H.’s best interest.  
See W.E.C., 110 S.W.3d at 247.  Accordingly, we hold that the 
evidence is factually sufficient to support the jury’s best interest finding.  
We overrule L.H.’s twelfth issue.
VII. Conclusion
        Having 
overruled all of L.H.’s issues, we affirm the trial court’s judgment.

 
 
                                                          SUE 
WALKER
                                                          JUSTICE
 
 
PANEL 
F:   LIVINGSTON, DAUPHINOT, and WALKER, JJ.
 
DELIVERED: 
November 18, 2004

NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
Texas Department of Family and Protective Services, sometimes referred to as 
“CPS.”
3.  
The trial court terminated the parental rights of S.W.W., J.H.’s father, in 
October 2000.  S.W.W., however, is not a party to this appeal.
4.  
Actually, TDFPS first became involved with L.H. back in 1994 when her four 
oldest children raised allegations that she was sexually abusing them.  The 
four oldest children now live with their father and are not involved in this 
appeal.
5.  
In December 1998, CPS received reports of physical abuse regarding J.H., but CPS 
ruled out those allegations.
6.  
L.H. started dating Schiska in May 1999.  She admitted that Schiska brought 
alcohol into her home, that he never signed the CPS placement plan, and that her 
caseworker had concerns about her relationship with him.
7.  
At trial, the parties stipulated to several portions of police officers’ 
reports, which were then read into the record.
8.  
Officer Whitehead testified that she was familiar with L.H. because the 
department had received “demented-person-type calls” about L.H.
9.  
L.H.’s child support payment deficiency totaled $5,991.08 at the time of the 
December 2003 trial.
10.  
In fact, the guardian ad litem had apparently decided before trial to recommend 
termination of L.H.’s parental rights because in her opening statements she 
told the jury the evidence would show that L.H. failed to keep her promises to 
“stay sober, stay stable, [and] take her prescribed medication” and that it 
was in J.H.’s best interest for L.H.’s parental rights to be terminated.
11.  
Section 161.001(1) lists nineteen acts that justify termination when coupled 
with a finding that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(1) 
(A)-(S).  Some of the acts listed include knowingly placing or knowingly 
allowing the child to remain in conditions or surroundings that endanger the 
child’s physical or emotional well-being, engaging in conduct or knowingly 
placing the child with persons who engage in conduct that endangers the 
child’s physical or emotional well-being, and failing to support the child in 
accordance with one’s ability during a period of one year ending within six 
months of the date of the filing of the petition.  Id. § 
161.001(1)(D)-(F).
12.  
L.H.’s MHMR worker thought that L.H. might become suicidal if she did not get 
to see J.H. that day.
13.  
During the ride to see J.H., L.H. admitted drinking alcohol before going to 
Charter and again before Dean picked her up at her apartment.
14.  
The record does not support L.H.’s argument.  All other children in 
J.H.’s foster family, other than his foster parents’ biological children, 
had been adopted.  Therefore, there is no reason to believe that the foster 
family wanted to continue to keep up the requirements for their foster license.
15.  
If he were to remain in foster care, J.H. would have a caseworker for the rest 
of his childhood and would be in TDFPS’s permanent custody until age eighteen.  
Consequently, any trips with the foster family or trips to camp would have to be 
approved by the court.