

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-22-00800-CV

**IN THE INTEREST OF E.A.R.**, E.A.R., E.A.R. and E.A.R.

From the 57th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-00214
Honorable Linda A. Rodriguez, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:        Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: June 21, 2023

AFFIRMED

Mother and Father appeal from the trial court's order terminating their parental rights. They both argue the bench trial did not commence before the mandatory dismissal date prescribed by section 263.401 of the Texas Family Code, making the termination order void. They also argue the trial court's termination order was signed after the date authorized by section 263.4011. Additionally, Father argues (1) the evidence is legally and factually insufficient to support its finding that termination of his rights was in his children's best interest; and (2) the trial court abused its discretion in making its conservatorship finding. We affirm.

**MANDATORY DISMISSAL DATE**

Section 263.401 requires a trial court presiding over a suit filed by the Department that requests termination of the parent-child relationship to commence the trial on the merits within one year after the initial temporary order. *See* TEX. FAM. CODE § 263.401. Under circumstances enunciated in section 263.401(b), the trial court may extend the one-year deadline, or "dismissal date." *See id*. § 263.401. If the trial court does not commence trial by the dismissal date or extend the dismissal date pursuant to subsection (b), the trial court's jurisdiction over the suit "is terminated and the suit is automatically dismissed." *Id*. § 263.401(a).

Both Mother and Father argue on appeal that the trial court failed to commence the trial on the merits by the mandatory dismissal date and thus lost jurisdiction over the termination suit. The parties agree that the dismissal date in this case was August 6, 2022. The parties disagree about whether the trial on the merits commenced before August 6, 2022. The record reflects that on February 4, 2021, the Department of Family and Protective Services ("the Department") filed its original petition seeking termination of parental rights to eight-year-old Evelyn, six-year-old Ethan, two-year-old Elijah, and one-year-old Eidan.[1] That same day, the trial court signed an emergency order removing the children from the parents' care and naming the Department as temporary conservator. On December 1, 2021, the trial court extended the mandatory dismissal date to August 6, 2022.

On July 20, 2022, the trial court held a hearing. It first considered Mother's motion to reconsider the trial court's denial of her motion for monitored return of the children. After the trial court denied Mother's motion to reconsider, the parties and the trial court discussed the mandatory

---

[1]To protect the identity of the minor children, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2). Because the children in this suit have the same initials, we refer to them by first names.

dismissal deadline of August 6, 2022. As a result of those discussions, the trial court decided to proceed with the bench trial on the merits, which had been scheduled for that day. The Department called the caseworker to the witness stand. The caseworker testified that she was the caseworker assigned to the case and that the parents were Mother, Father (father to Elijah and Eidan), and two other fathers (fathers to Evelyn and Ethan, respectively).[2] She testified that at the time of the hearing, Evelyn was nine years old; Ethan was seven years old; Elijah was three years old; and Eidan was two years old. She further testified (1) Evelyn was placed with her paternal grandmother, (2) Elijah and Eidan were placed in a foster-adopt home, and (3) Ethan was placed with a foster father. She testified those placements were meeting the children's needs. The Department then requested that the trial court continue the trial to a later date. The trial court granted the request. On September 1, 2022, the trial continued. At the end of the day on September 2, 2022, the trial court continued the trial until October 13, 2022. After hearing testimony on October 13, 2022, the trial court took the matter under advisement. On December 28, 2022, the trial court signed the order terminating Mother's and Father's parental rights.

On appeal, Mother and Father argue that the trial on the merits did not "commence" on July 20, 2022, because the Department did a "brief examination" of the witness with the intention of "stopping the clock" on the mandatory dismissal date. They contend that the analysis of whether a trial "commences" should focus "on what it means to commence a 'trial' or 'final hearing,' which would require a more involved hearing in which both sides have an opportunity to examine a witness, and the witness provides testimony that establishes at least one element of the offense(s) being charged against the parent(s)." They cite no legal support for this assertion.

---

[2]Evelyn's and Ethan's fathers have not appealed the trial court's termination order.

This court has previously held that trial commenced for purposes of section 263.401 when the Department called its first witness who then provided brief testimony before trial was recessed. *See In re R.F.*, No. 04-17-00582-CV, 2018 WL 1308542, at *1 (Tex. App.—San Antonio Mar. 14, 2018, no pet.). The record in this case clearly shows that the trial court began the trial on July 20, 2022, and the Department called its first witness who gave brief testimony. Thus, under our prior precedent, trial commenced for purposes of section 263.401 before the mandatory dismissal date. *See id*.

Nonetheless, Mother and Father argue that what occurred on July 20, 2022 should not be considered as the commencement of trial because calling the caseworker to the stand to give brief testimony was done for the sole purpose of avoiding the mandatory dismissal deadline. In *In re Z.S.*, 631 S.W.3d 313, 317 (Tex. App.—Houston [14th Dist.] 2020, no pet.), the Fourteenth Court of Appeals considered this same argument. The appellant in that case argued the trial court did not "commence" the trial before the mandatory dismissal date because the hearing held before the dismissal date was a "'sham,' carried out with the 'sole intent' to retain the case on the court's docket beyond the automatic dismissal date." *Id*. The court of appeals rejected this argument, reasoning that whether the proceeding was a "sham" was an issue for the legislature and not the court. *Id*. at 318. The court of appeals explained that section 263.401 "requires only that trial on the merits 'commence' by the deadline, and here trial commenced before that deadline and before the court lost jurisdiction." *Id*. at 319. We agree with the Fourteenth Court of Appeals. In looking at the plain language of section 263.401, the only issue for this court is whether the trial *commenced* before the mandatory dismissal deadline. The record shows that it did.

Mother and Father further argue that even if this court determines that the trial commenced on July 20, 2022, the trial court did not render a final order in compliance with section 263.4011. Section 263.4011 provides that a trial court "shall render a final order not later than the 90th day

after the date the trial commences." *See* TEX. FAM. CODE 263.4011. Mother and Father point out that the date the trial court signed the final order, December 28, 2022, is more than ninety days after trial commenced on July 20, 2022. Thus, they argue the trial court did not comply with section 263.4011. However, section 263.4011 became effective on September 1, 2021, and applies only to a suit filed by the Department on or after its effective date. *See* Act of May 25, 2021, 87th Leg., R.S., ch. 8 (H.B. 567), § 10. As the Department filed its original petition in this cause on February 4, 2021, before the effective date, section 263.4011 does not apply. Therefore, we find no merit to Mother's and Father's argument. Having overruled Mother's sole appellate issue, we affirm the trial court's order terminating her parental rights.

## BEST INTEREST

Father argues the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in his children's best interest. To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (citation omitted). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is

factually insufficient." *Id*. (citation omitted). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*. at 346.

Further, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[3] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[4] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re J.J.V.M.M.*, No. 04-22-00405-CV, 2022 WL 17479144, at *5 (Tex. App.—San Antonio Dec. 7, 2022, no pet. h.) (explaining that a best interest finding does not require proof of any particular factor). "Evidence of a single factor may be

---

[3]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[4]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied).

In determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28.

In arguing his insufficiency issue, Father points to evidence that he has a bond with Elijah and Eidan, he has a job as an electrician, he has adequate housing, and he competed several services under his service plan. In response, the Department points to the evidence in the record of domestic violence and substance abuse. At trial, Mother testified that Father had physically abused her in front of all the children and that she had sought a protective order against him. She testified that in a previous family-based case, Father tested positive for methamphetamines and that under the safety plan, he was not allowed to be around the children unless the appointed "safety person" was with him. Mother further testified about an incident where she interpreted a remark Father made as a threat to kill her. Mother testified,

> [Father] was pushing me out of his front door, [and] he mentioned that the kids—
> you know, he was going to stay with . . . Eli[jah] because that's all he had. He
> couldn't get Eidan. And if tried to interfere or anything that he would get me
> handled. It didn't have to be him, specifically. And that I-I should know what that
> means.

Father disputed this allegation, testifying Mother was lying.

There were other witnesses who testified about Mother and Father's relationship. The children's maternal aunt testified Mother and Father have a "very toxic relationship" "because of domestic violence issues that they've had between them." Similarly, Father's therapist testified that the relationship between Mother and Father was "very toxic" and that Father knew "he needs

to stay away from her, but when she calls and starts talking, he has a tendency to fall for it, gets involved with her again, and then he gets hurt." It is undisputed that Father continued to see Mother during the pendency of this case. The Department's investigator testified that at the end of the last family-based case involving Mother and Father, Mother was directed not to let Father back in the home because he had not completed services for domestic violence. When the investigator arrived at the home to remove the children, Father was present. According to the investigator, she asked Father who he was, but he did not want to answer or have Mother identify him. The investigator testified, "[Mother] was cussing at the kids, and she was cussing at me, too, saying that she was tired of CPS, that she already had done this, and that there's nothing going on, that there's no abuse, that she had already completed two rounds of family based." As factfinder, the trial court could have found the testimony about the domestic violence between Mother and Father to be credible and Father's testimony not to be credible. *See In re J.O.A.*, 283 S.W.3d 345 (explaining the factfinder is the sole judge of the weight and credibility of the evidence).

There was also evidence that Father had not successfully addressed his substance abuse issues. Father's therapist testified that one of the reasons Father had not successfully completed therapy was because he had not shown he was "drug free." Father's therapist testified that in the beginning of the case, Father acknowledged that he had a problem with drugs and that he had tested positive for methamphetamine. Thus, in the beginning, the therapist was more positive about Father addressing his substance abuse issues. During the pendency of the case, however, Father was arrested twice for possession of a controlled substance: once in March 2021 and once in April 2022. His therapist testified that a month or so after one of the arrests, Father discussed the arrest and said the arrest was random and the charges were going to be dismissed. The therapist testified Father's arrest was a cause for concern because Father was continuing to minimize his drug problem. There was also evidence that Father failed to submit to drug testing on multiple

occasions. Father testified he did not submit because he was out of the state working. The trial court, however, could infer that Father failed to submit to drug testing because he was using illegal drugs. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs."); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (same).

Additionally, there was evidence that Father was attempting to fake a urine test. The caseworker testified that on her last home visit at the end of May 2022, she "found a—what appeared to be a device to hold urine and had a temperature gauge and a long tube. It appeared to me that it was something to fake a drug test, and it was heating up in the sun." When she asked Father about the device, he said the device was not his, and "he didn't know why it was there or whose it was." She testified that at the end of the visit, Father accused her of putting the device there. At trial, Father testified it "was a nontoxic liquid." When pressed, he could not say what the liquid was. He claimed that he had "a friend coming over" who "liked to use it in sex." Again, as factfinder, the trial court could have found the caseworker's testimony to be credible and Father's testimony not to be credible. *See In re J.O.A.*, 283 S.W.3d at 345 (explaining the factfinder is the sole judge of the weight and credibility of the evidence).

There was also evidence that although Father was employed as an electrician, his job was not appropriate for taking care of small children like Elijah and Eidan as his job required him to travel out of state constantly. Father testified he works in different states depending on where his company sends him. According to Father, his current job "is one hundred percent travel." His therapist testified that Father had not made "progress on stability," pointing to the fact that Father was still traveling out of state for his job. While Father testified that he has had local job offers and could obtain a local job if the children were returned to him, the trial court could have

reasonably found it significant that Father had made no attempts before trial to obtain a local job so that he could care for his children. Indeed, Father admitted during his testimony that because of his travel, he had been inconsistent in visiting the children during the pendency of this case, estimating that he had visited his children "probably about thirty" times out of a possible fifty-two visits.

Finally, there was evidence that the children were doing very well in their current placement. Their foster mom testified about her love for the boys, who at the time of trial had just turned three and four years of age. She testified that Elijah and Eidan had lived with her and her husband for a year and that the boys had bonded with them. While she has been trying to help the reunification process, she testified she and her husband would like to adopt the children if the parents' rights were terminated. According to the foster mom, she and her husband had maintained relationships with the boys' other siblings who had been placed in other homes. Elijah and Eidan regularly visited their siblings, and the foster mom intended to maintain those relationships if she and her husband were allowed to adopt the boys. The foster mom testified that since the boys were first placed in her home, their behaviors had changed "tremendously." The boys were very insecure at the beginning and would "just yell at the top of their lungs." "They would scream, 'Go away!'" She testified, "I mean, you would have thought that we were really getting after them, you know, for the tiniest little thing. It was just a lot, a lot of anger and confusion." Now, however, while they still have "little tantrums here and there," their outbursts are "more appropriate for their age." She testified,

> You can see that they feel loved[,] they feel secure[,] and they feel safe here. And that consistency and stability has just brought out a lot of joy in them.

Likewise, the CASA advocate testified that during the pendency of the case, she had "watched the children go from very angry and upset, and having many tantrums to being very calm, happy, smiling."

In considering all the evidence in the light most favorable to the finding, we hold the trial court could have reasonably formed a firm belief or conviction that its best-interest finding was true. *See In re J.O.A.*, 283 S.W.3d at 344. Therefore, we hold the evidence is legally sufficient. Furthermore, while Father has pointed to evidence that his children love him and that he has employment and a home, there was other evidence in the record from which the trial court could have reasonably determined that termination of his parental rights was in children's best interest. *See id.* at 345. Therefore, we hold the evidence is also factually sufficient to support the trial court's best-interest finding.

### CONSERVATORSHIP

In his final issue, Father argues that if the trial court's termination order is reversed on appeal, the trial court's conservatorship order should also be reconsidered. However, as we have determined the trial court did not err in terminating Father's parental rights, Father's argument has no merit. *See In re C.J.Y.*, No. 04-20-00009-CV, 2020 WL 3441248, at *7 (Tex. App.—San Antonio June 24, 2020, pet. denied); *see also In re M.R.D.*, No. 04-19-00524-CV, 2020 WL 806656, at *9 (Tex. App.—San Antonio Feb. 19, 2020, pet. denied) (holding that because the trial court did not err in terminating appellant's rights, appellant no longer had any legal rights to her children and could not challenge the portion of the termination order that related to the appointment of conservators); *In re L.T.P.*, No. 04-17-00094-CV, 2017 WL 3430894, at *6 (Tex. App.—San Antonio 2017, pet. denied) (same).

## CONCLUSION

For the reasons stated above, we affirm the trial court's order terminating Mother's and Father's parental rights.

Liza A. Rodriguez, Justice